Howard Virgil Lee DOUGLAS,
Petitioner,

v.

Louie L. WAINWRIGHT, Secretary, Florida Department of Offender Rehabilitation, and David H. Brierton, Superintendent of Florida State Prison at Starke, Florida, Respondents.

No. 79–755 Civ. T–K.

United States District Court,
M. D. Florida,
Tampa Division.

Aug. 25, 1981.

Elliott C. Metcalfe, Jr., Public Defender, Larry Helm Spalding, Sarasota, Fla., for petitioner.

Richard W. Prospect, Asst. Atty. Gen., Tallahassee, Fla., Robert J. Landy, Asst. Atty. Gen., Tampa, Fla., for respondents.

## MEMORANDUM OF OPINION

KRENTZMAN, District Judge.

Howard Virgil Lee Douglas was convicted in a Florida State court of first degree murder and a death sentence imposed.

His conviction was affirmed by the Florida Supreme Court in *Douglas v. State*, 328 So.2d 18 (Fla.) (*Douglas* 1), cert. denied 429 U.S. 871, 97 S.Ct. 185, 50 L.Ed.2d 151 (1976), *reh. denied* 429 U.S. 1055, 97 S.Ct. 770, 57 L.Ed.2d 771 (1977). On July 17, 1979, his death warrant was signed and his execution scheduled for July 26, 1979. On July 17, 1979, a motion for post conviction relief was filed, heard and denied in the appropriate state trial court. On July 18, 1979, a petition for leave to proceed in forma pauperis and for federal habeas corpus pursuant to 28 U.S.C. § 2254 was filed in this Court. Leave to proceed was granted that day and hearing was scheduled for July 24, 1979.

On July 20, 1979, the Supreme Court of Florida affirmed the order denying post conviction relief and denied a stay of execution. *Douglas v. State*, 373 So.2d 895 (Fla. 1977) (*Douglas* 2).

Hearing on petitioner's motion to stay execution and habeas petition was heard July 24, 1979.

At hearing counsel for petitioner urged six claims. Petitioner did not seek an evidentiary hearing and the Court found that none was required.

Upon consideration of the court records in both the trial court and the Supreme Court of Florida, including a complete transcript of the trial proceedings, and memoranda and argument of respective counsel, this Court found that five of the claims were insubstantial but that petitioner's claim of denial of a public trial presented a substantial question justifying a stay of execution and further consideration. A stay was entered July 24, 1979, and the issues taken under advisement. 28 U.S.C. § 2251 (1976); *Brent v. White*, 389 F.2d 503, 507 (5th Cir. 1968). This opinion upon the merits follows.

The claims will be considered in the order in which they are listed in the petition.

### 1.

CLAIM THAT PETITIONER WAS SENTENCED TO DEATH BY THE USE OF INVALID PRIOR CONVICTIONS IN DEPRIVATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS.

Florida sentencing procedure in capital felony cases, as analyzed and approved in *Proffit v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), provides in pertinent part as follows:

(1) SEPARATE PROCEEDINGS ON ISSUE OF PENALTY. Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082.

. . . . .

(2) ADVISORY SENTENCE BY THE JURY. After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:

(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5);

(b) Whether sufficient mitigating circumstances exist as enumerated in subsection (6), which outweigh the aggravating circumstances found to exist; and

(c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

(3) FINDINGS IN SUPPORT OF SENTENCE OF DEATH. Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:

(a) That sufficient aggravating circumstances exist as enumerated in subsection (5), and

(b) That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances.

In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (5) and (6) and upon the records of the trial and the sentence proceedings. If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with s. 775.082.

Fla.Stat.Ann. § 921.141 (Supp. 1981 West).

Petitioner contends that his rights were violated when the trial judge examined a presentence report that contained convictions resulting from court appearances when petitioner was not represented by counsel, in violation of *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

The Florida Supreme Court gave some support to this possibility, and to the possibility that it had likewise considered such convictions in its review of petitioner's sentence. (*Douglas* 1), *supra*, 328 So.2d at 18.

The trial judge however, in his findings of fact entered in accord with Fla.Stat.Ann. § 921.141(3) (Supp. 1981 West), Appeal Record 759 said:

The presentence investigation report was considered only in the light of its failure to reflect mitigating circumstances.

He repeated this statement at hearing on a motion for post conviction relief held on July 17, 1979. *See* Transcript of proceedings thereof at page 7. In *United States v. Gaither*, 503 F.2d 452 (5th Cir. 1974) the court held that it is not inherently impossible for a court to disclaim consideration of a prior unconstitutional conviction in assessing sentence while still possessing knowledge thereof. The law requires that uncounseled convictions not be used against a defendant. It is clear that this did not occur here. Petitioner's claim on this ground is clearly insubstantial.

2.

CLAIM THAT PETITIONER WAS DENIED HIS RIGHT TO A PUBLIC TRIAL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS.

This is the issue I found to be substantial and worthy of careful consideration. At about the time of the stay there were important "public trial" cases which had recently been and were before the Supreme Court of the United States, i. e. *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) and *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

While the "public trial" issue in each of those cases was different from that under consideration, the opinion in each is helpful to decision here.

The principal witness for the state was Mrs. Helen Atkins. Immediately prior to her testimony the trial judge instructed the jury as follows:

THE COURT: Ladies and gentlemen, a motion has been made that the—due to the nature of the testimony as anticipated by the State to be produced—that the Courtroom be cleared of all personnel who are not part of the official actions in this case.

Our Constitution and laws provide for a public trial and this is the right of every individual. I wish to assure the guarantee of a public trial and I will permit members of the family of the Defendant here____

MR. CAMPBELL: Then you ought to also permit the members of family of the deceased.

THE COURT: ___and the members of the family of Jessie William Atkins, Jr.___

MR. CAMPBELL: ___and Helen Atkins.

THE COURT: ___and Helen Atkins and the representatives of the Press. Other than that, I would like everyone else to leave and—until this phase of the case has been completed.

(The spectators left the Courtroom.)

II Trial Transcript 214–15.

Thus it appears that during her testimony attendance was restricted to relatives, counsel, court officials and newspaper reporters.

The Sixth Amendment to the United States Constitution guarantees to an accused the right to a "public trial." This limitation operates upon the states by virtue of its incorporation into the due process clause of the fourteenth amendment. *In Re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). As then United States District Judge Frank M. Johnson, Jr. said in an opinion adopted by the appellate court in *Aaron v. Capps*, 507 F.2d 685, 692 (5th Cir. 1975), "[t]he guidelines of this right to a public trial are unclear. 'Without exception, all courts have held that an accused is at the very least entitled to have his friends, relatives, and counsel present, no matter with what offense he may be charged.'" (citing *Oliver* 333 U.S. at 271, 272, 68 S.Ct. at 506–07).

As Justice Powell said in his concurring opinion in *Gannett*.

The right or access to courtroom proceedings, of course, is not absolute. It is limited both by the constitutional right of defendants to a fair trial, see, e. g. *Estes v. Texas*, 381 U.S. 532 [85 S.Ct. 1628, 14 L.Ed.2d 543] (1965), and by the needs of government to obtain just convictions and . . . .

443 U.S. at 398, 99 S.Ct. at 2915, 61 L.Ed.2d at 633 (citations omitted).

As Justice Black said in discussing the analogous right of the "state" to an impartial jury in his dissent in *Witherspoon v. Illinois*, 391 U.S. 510, 535, 88 S.Ct. 1770, 1784, 20 L.Ed.2d 776 (1968),

The obvious purpose of this section is to insure, as well as laws can insure such a thing, that there be an impartial jury in cases in Illinois where the death sentence may be imposed. And this statute [allowing peremptory challenge in Illinois death case if juror says he has conscientious scruples against capital punishment] recognizes that the people as a whole, or as they are usually called, "society" or "the state," have as much right to an impartial jury as do criminal defendants.

▮ Thus, to carry its burden of proving guilt the "state" is entitled to the admissible testimony of its witnesses, and if the nature thereof and the experience of the witness would deny the state the ability to present it without some limitation on trial attendance, then reasonable limitation is permissible.

Helpful guidelines in testing trial attendance limitations are found in *United States ex. rel. Latimore v. Sielaff*, 561 F.2d 691, 694 (7th Cir. 1977).

Because the public trial guarantee not only prohibits secrecy but also reflects a preference for an open forum, prejudice to the defendant is implied whenever the trial judge lacks substantial justification for excluding spectators, and an affirmative showing of harm is unnecessary to establish a violation of the defendant's right to public trial.

As Justice England of the Florida Supreme Court suggested in his dissenting opinion in (*Douglas* 1), *supra* at 22, there is no current support in the law for the view that judicial proceedings should be closed to protect the public morality. And, as Justice Powell suggested in *Gannett, supra*, 99 S.Ct. at 2915, the action of limiting trial attendance must be tested by considering the degree of limitation, and the circumstances of the case.

In this case reasons given for the limitation could have been clearer and more complete. The court's instruction to the jury

has been given. The motion of the state's attorney and colloquy of the parties is as follows:

MR. CAMPBELL: I am making a motion that due to the nature of the testimony of the next witness, Helen Atkins, that the Court order that the Courtroom be cleared of all except necessary Court personnel.

MR. KIRKLAND: The Defense will object, because she's not a person of young and tender years. There are ladies on the jury that are going to have to hear this and I think she should confront society with her testimony as well.

I think the Defendant has a right to a fair trial and to a public trial.

MR. CAMPBELL: Your Honor, I think that regardless of whether she's a person of young and tender years—I'm not sure how far that goes----

THE COURT: Let me see you gentlemen up here.

(Counsel approached the bench.)

THE COURT: Do you feel that this is so embarrassing to her----

MR. CAMPBELL: It could be, Your Honor.

THE COURT: ----do you feel this is embarrassing to her or are you trying to save the women in----

MR. CAMPBELL: I think its not only embarrassing to her, Your Honor, I think that it's such that I don't see any reason for some of the people in the audience to sit and listen to this sort of testimony, as I've indicated to the jury.

I don't see any reason that anybody ought to hear it unless it's absolutely necessary.

THE COURT: Is there any members of the Defendant's family in the audience?

MR. CAMPBELL: Yes, Your Honor.

THE COURT: How many?

MR. KIRKLAND: One or two.

THE COURT: Is the Press here?

MR. KIRKLAND: I assume there are members of the Press.

II Trial Transcript 213–14.

Given the type of case, the size of the community and normal pretrial publicity, common sense suggests that both the prosecuting attorney and the trial judge knew of the background of Mrs. Atkins and her expected testimony. It seems reasonable that neither felt the need to state the obvious.

The central issue here is not the reasons given for the limitation on trial attendance, but the need therefor and likely result thereof.

Traditionally, the reasons for not limiting attendance include (1) the dangers of secret proceedings (2) open proceedings give notice to the world of the details of the case, thus encouraging potential and previously unidentified witnesses to volunteer their knowledge, and (3) the likelihood that more truthful testimony will result if given in open court in the presence of the public.

In differing degrees the limited closing here with members of the families of the witness and the defendant, and representatives of the press present satisfy each of these three. Certainly the newspaper reporters present guarantee that there was no secret trial and gave notice of the trial details to the community. Consideration of the third reason requires an understanding of the witness, Mrs. Atkins, and her expected trial testimony.

At the time of the trial Mrs. Atkins was twenty years old. Specific details are not available, but it is obvious that she had a limited education. At age 13 she was in an automobile accident and was injured. She had two children and as the court said in (*Douglas* 1) at page 20.

She testified as to having met the appellant, Howard Virgil Lee Douglas, and the victim, Jesse "Jay" William Atkins, at about the same time. She lived with the defendant for periods of time before and after her marriage to the victim. She had resumed living together with her husband for some short period of time up to the date of the crime.

While she was sexually mature, she was neither sophisticated nor experienced at public appearances.

Her trial testimony is accurately paraphrased by the Florida Supreme Court in (*Douglas* 1), *supra*, 328 So.2d at 20, (except for the year of the event, which was 1973).

On the afternoon of July 16, 1963 (sic), Helen Atkins learned that she was being evicted by her landlord from the trailer she rented. She proceeded with the victim to the trailer in the vicinity of Bowling Green, Florida, and gathered up her belongings. On the way back the defendant drove up behind them in his truck and ordered the victim who was driving their automobile to pull over to the side of the road. With the use of a rifle, the defendant required them to proceed in a rather complicated route. At one point the vehicle became stuck. At defendant's direction all three walked to a mine where they got a man to take them back in a truck and free the vehicle. The defendant then required them to proceed to a wooded area near Brewster, Florida. The defendant then made her and the victim undress and perform various sexual acts before him. The defendant then struck the victim in the head with the butt of his rifle, with such force that the stock of the rifle was shattered. The defendant then fired three shots into the head of the victim. Helen Atkins was then ordered to perform certain sexual acts upon and with the defendant. The body of the victim was later covered with grass and bushes.

A defendant is entitled to have testimony against him subjected to cross-examination and given under public scrutiny.

The record does not indicate how many spectators were excluded and how many family members, etc. remained; but it is obvious that some spectators were excluded, and including jurors, normal court personnel, the lawyers and a reasonable approximation of family members there were about twenty-five persons other than the witness and defendant in attendance.

In discussing the possible effect of televised trials upon the candor of witnesses, Justice Harlan in his concurring opinion in *Estes v. Texas*, 381 U.S. 532, 595, 85 S.Ct. 1628, 1666, 14 L.Ed.2d 543 (1965) said:

It is also asserted that televised trials will cause witnesses to be more truthful, and jurors, judges, and lawyers more diligent. To say the least this argument is sophistic, for it is impossible to believe that the reliability of a trial as a method of finding facts and determining guilt or innocence increases in relation to the size of the crowd which is watching it. Attendance by interested spectators in the courtroom will fully satisfy the safeguards of 'public trial.' Once openness is thus assured, the addition of masses of spectators would, I venture to say, detract rather than add to the reliability of the process. See *Cox v. Louisiana*, 379 U.S. 559, 562 [85 S.Ct. 476, 479, 13 L.Ed.2d 487]. A trial in Yankee Stadium, even if the crowd sat in stony silence, would be a substantially different affair from a trial in a traditional courtroom under traditional conditions, and the difference would not, I think, be that the witnesses, lawyers, judges, and jurors in the stadium would be more truthful, diligent, and capable of reliably finding facts and determining guilt or innocence.

Upon full consideration, I find that in the exercise of his discretion the trial judge correctly balanced the needs and rights of the parties and accorded each a fair trial while preserving the common law tradition of open proceedings and avoiding additional and unnecessary insult to the dignity of the witness. This second claim of the defendant is, under the circumstances, without merit.

### 3.

CLAIM THAT THE EXCLUSION FOR CAUSE OF VENIREPERSONS WITH CONSCIENTIOUS SCRUPLES AGAINST THE DEATH PENALTY DEPRIVED PETITIONER OF HIS RIGHT TO EQUAL PROTECTION OF THE LAWS AND DUE PROCESS OF LAW GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND DEPRIVED PETITIONER OF A REPRESENTATIVE JURY SELECTED FROM A FAIR CROSS-SECTION OF THE POPULATION GUARANTEED BY THE SIXTH AMENDMENT.

At the trial of this case three venirepersons were excused for cause over objection of defendant.

This claim raises what have been called "*Witherspoon*" issues after that case, *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 26 L.Ed.2d 776 (1970).

The state asserts that this issue is here raised for the first time, and that the issue was not brought before the Florida courts for review. While it is clear that petitioner's counsel at trial objected contemporaneously to the exclusion of these three jurors, *see* I Trial Transcript at 73–76, 120–23, it is not clear whether this objection was later perfected at the conclusory phases of the trial or whether the issue, if perfected, was presented to the appropriate Florida District Court of Appeal for review. Petitioner's brief to the Florida Supreme Court (see Exhibit II) does not raise the issue, and it is not addressed by the Florida Supreme Court in its disposition of the case (*Douglas 1*).

The state cites *Wainwright v. Sykes*, 434 U.S. 880, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and *Lumpkin v. Ricketts*, 551 F.2d 680 (5th Cir.1977), for the proposition that petitioner has waived his rights to appeal this issue because it has not been heretofore raised. Absent a showing of cause or prejudice, issues not perfected for appeal during the trial phase of a lawsuit may indeed be deemed waived. *Wainwright v. Sykes, supra*, 434 U.S. at 85, 97 S.Ct. at 2506.

Resolution of the waiver issue from the record is difficult and would be subject to argument. Because of the result reached today, the Court will consider the merits of the exclusion of the three venirepersons from the jury. Were the result different, detailed examination of the potential procedural defect would of course be required.

The effect of *Witherspoon* and its progeny is fully developed in *Burns v. Estelle*, 592 F.2d 1297, 1300 (5th Cir.1979) *Approved en banc* 626 F.2d 396 (5th Cir.1980). There Judge Gee speaking for the court said:

And so our survey of ruling Supreme Court law in the area is complete. It may be summarized:

1. Only the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds. A mere disbelief in it, or even 'conscientious or religious scruples against its infliction' will not suffice, since many people hold such views and some of these may yet be able to overcome them and abide by the law.

2. No jury from which even one person has been excused on broader *Witherspoon*-type grounds than these may impose a death penalty or sit in a case where it may be imposed, regardless of whether an available peremptory challenge might have reached him.

Whether there was error in excusing a juror on "Witherspoon" grounds requires an examination of the voir dire proceedings. The critical question is how the phrases used in questioning jurors might be understood or misunderstood by the prospective jurors. *Boulder v. Holman*, 394 U.S. 478, 482, 89 S.Ct. 1138, 1140, 22 L.Ed. 433 (1969) (quoting *Witherspoon, supra*, 391 U.S. at 4516 n.9, 88 S.Ct. at 1773 n.9). Both the trial judge and the states attorney participated in relevant portions of the voir dire in this case. It is obvious that each understood and appreciated the applicable requirements of the law. Three persons were excused, a Mrs. Shiel, a Miss Morren, and a Mrs. Gossett. Each heard the instructions and questioning of other jurors.

The questioning of Mrs. Shiel by the state's attorney was as follows:

I'm posing questions to you now, as we all know, but sit there and attempt to arrive at what the truth of this particular case is and then vote your convictions, your own personal convictions as to what the truth is?

Are each of you willing to do that?

Mrs. Shiel, did you have a question?

MRS. SHIEL: I don't believe you asked me if I had any conscientious or religious scruples, did you?

MR. CAMPBELL: Mrs. Shiel, I'm not sure, but you tell me whether you do or not.

MRS. SHIEL: Yes, I do.

MR. CAMPBELL: You do have. Is that conviction—then I assume its opposed to the death penalty—is that conviction such—and you heard the question that we put to these other ladies and gentlemen—is that conviction such that you could not find this defendant—that you would automatically not find this defendant guilty of first degree murder on the first trial?

MRS. SHIEL: I don't believe I could be party to anything like that.

MR. CAMPBELL: And by that, are you telling me that because if you voted first degree murder in the first trial, because if the majority of the jurors might recommend no mercy and because Judge Love might accept that recommendation and it would result in the death penalty that you would feel that you could not vote for a verdict of first degree murder in the first trial?

MRS. SHIEL: The first time has to be unanimous?

MR. CAMPBELL: Yes ma'am.

MRS. SHIEL: I don't believe I could.

MR. CAMPBELL: You don't believe you could vote for first degree in the first trial, because of your conviction of___

MRS. SHIEL: Yes.

MR. CAMPBELL: ___your opposition to the death penalty. Your Honor, I think that's___

THE COURT: You may step down, then.

MR. KIRKLAND: The defendant wishes to note objection as to the excusing of the juror, violating his constitutional right to trial by his peers.

THE COURT: Excused for cause.

I Trial Transcript 73–74.

Clearly there was cause to excuse her.

The questioning of Miss Morren was by the judge and the state's attorney.

THE COURT: Miss Morren, will you please introduce yourself to us?

MISS MORREN: I'm Rebecca Morren. I'm a payroll clerk for General Telephone. I live in Timberlake Estates in Lakeland.

THE COURT: May I see Counsel at the bench?

(Informal discussion off the record out of the hearing of the jury and Court Reporter.)

THE COURT: If I posed those same questions to you would you give the same answers that she gave?

MISS MORREN: Yes.

THE COURT: Counsel for the State may inquire.

MR. CAMPBELL: Is it Miss or Mrs. Morren?

MISS MORREN: Miss.

MR. CAMPBELL: What do you do?

MISS MORREN: I'm a payroll clerk.

MR. CAMPBELL: Where?

MISS MORREN: General Telephone.

MR. CAMPBELL: Miss Morren, do you have conscientious or religious scruples against the death penalty?

MISS MORREN: No sir.

MR. CAMPBELL: You've heard the conversation that I had with Mr. Davis and the conversation that I had with Mrs. Shiel? Do you think that your feelings are such that you could not render a verdict of guilty of murder in the first degree, that you would automatically have to vote against first degree at the first trial because of your feelings about the death penalty, because it might subsequently result in the death penalty?

MISS MORREN: Yes sir.

MR. CAMPBELL: You think you would have to automatically vote against first degree murder?

MISS MORREN: Yes.

MR. CAMPBELL: The State would object and challenge for cause, Your Honor.

MR. KIRKLAND: Let the record note the same objection.

THE COURT: You may step down.

Id. at 74–76.

There also was cause to excuse Miss Morren.

Mrs. Gossett was questioned by the court.

THE COURT: Under this new system of our laws in handling capital felony cases, the jury hears the testimony, the argument of counsel, the rules of law as given you by the Court, and retires and brings in the verdict of guilty or not guilty or perhaps guilty of a lesser included offense.

Then if the defendant is convicted by the verdict of the jury of a capital felony, I will also advise that the jury will have a separate trial. You will hear any evidence or testimony from both the defendant and the State upon all material factors with regard to a decision whether the jury wishes to recommend the defendant in making its decision.

The opinion of the jury is basically advisory to the Judge, because in ultimate analysis the responsibility is laid squarely upon the advisors for the entry of the penalty he expects to give.

I ask you then—knowing that many people have conscientious or religious scruples against the death penalty and this is perfectly all right, this is within the conscience and the moral feelings of the individual himself—but I ask you if the fact that perhaps a verdict of guilty might ultimately lead to the imposition of the death penalty upon the defendant would keep you from bringing in a truthful verdict touching upon his guilt or innocence?

MRS. GOSSETT: I don't believe in capital punishment.

THE COURT: This is all right, ma'am; that's your privilege. But I'm saying—what I'm saying is that would—if he's found guilty, then it must be a unanimous vote of the jury. Then the jury, by a majority vote, after hearing testimony which they will not hear during the process of the trial, will bring in a recommendation to the Court by a majority vote, which is not binding upon the Judge, but serves as advice to the Judge.

Will you still bring in a truthful verdict touching upon the guilt or innocence of the defendant even though ultimately it may be—or could be that the Judge could sentence him to death?

MRS. GOSSETT: I don't know; I just don't believe in capital punishment.

THE COURT: Yes ma'am, this is your right and you have a right to vote against and recommend that it not be capital, but the advice, of course, comes from a majority of the jury.

MRS. GOSSETT: Yes Sir.

THE COURT: It is possible that a majority of the jury may not agree with you, but my question is, if you are convinced that he is guilty of the crime of murder in the first degree, will you bring in that verdict of murder in the first degree or will you insist upon doing something which is—does not meet your convictions?

MRS. GOSSETT: Well, I don't know exactly how to answer that. I guess they could argue that.

THE COURT: No, I'm talking about this first trial. All you're going to decide is whether he is guilty or not guilty.

MRS. GOSSETT: Yes sir.

THE COURT: Can you sit on this jury and bring in a verdict on that basis without regard to what might happen in the future, because you can't possibly know what might happen in the future at the time you bring in your verdict?

MRS. GOSSETT: Well, I just don't know.

THE COURT: You're going to take an oath to well and truly try the issues in this case and a truthful verdict bring in.

MRS. GOSSETT: Yes.

THE COURT: I'm just asking you if the fact you're opposed to capital punish-ment___

MRS. GOSSETT: Yes sir, I'm opposed to it.

THE COURT: That's all right. ___but would that interfere with you bringing in a truthful verdict as is touching____

MRS. GOSSETT: Yes.

THE COURT: ___guilt or innocence____

MRS. GOSSETT: I think so.

THE COURT: Ma'am?

800

MRS. GOSSETT: I think so.

THE COURT: All right. We excuse you.

*Id.* at 119–122.

■ Although the trial judge was again conducting the proper inquiry under *Witherspoon*, in that he was asking specifically whether her opposition to capital punishment would interfere with her "bringing in a truthful verdict touching upon guilt or innocence," this venireperson initially did not respond in the unequivocal fashion that would, at that point, permit her exclusion for cause. Indeed, without further questioning, this would appear akin to the situation in *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970), in which venirepersons were *improperly* removed for stating that they "thought" or "were afraid" that their beliefs would prevent their rendering a guilty verdict. Here, however, the question asked was more specific: "Will you still bring in a *truthful* verdict touching upon the guilt or innocence of the defendant even though ultimately it may be—or could be that the Judge could sentence him to death?" I Trial Transcript at 121 (emphasis supplied). Moreover, as specifically contemplated by the Fifth Circuit in *Burns v. Estelle*, 592 F.2d at 1301, the judge persisted in his examination of Mrs. Gossett in order to ascertain whether her views would interfere with her being an impartial and truthful juror. Mrs. Gossett answered "yes," that her belief would interfere with her bringing in a truthful and impartial verdict.

This Court has no doubt that Mrs. Gossett understood the meaning of the judge's questions when taken as a whole. *Boulder v. Holman, supra*, 394 U.S. at 482, 89 S.Ct. at 1140. This appeared largely due to the judge's proper and persistent questioning of her. She expressed an unequivocal view, albeit after repeated examination, that her attitude toward the death sentence "would prevent (her) from making an impartial (and truthful) decision as to defendant's guilt." *Witherspoon v. Illinois, supra,* 434 U.S. at 522–23, n. 21, 88 S.Ct. at 1777, n. 21 (emphasis in original); *Lockett v. Ohio, supra.*

The Court finds that Mrs. Gossett, like the other two venirepersons, were properly excluded for cause from the jury under the standards set forth in *Witherspoon v. Illinois, supra,* and related cases.

This claim is without merit.

4.

PETITIONER'S SENTENCE OF DEATH IS UNCONSTITUTIONAL BY THE TRIAL COURT'S REFUSAL AND THE FLORIDA SUPREME COURT'S REFUSAL TO RESPECT THE JURY'S UNANIMOUS VERDICT RECOMMENDING LIFE IMPRISONMENT. THIS VIOLATES THE FIFTH, SIXTH, EIGHTH, NINTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

■ In support of this claim counsel for petitioner in their memorandum in support of petitioner's application for stay of execution raise all known objections to the death penalty. They admit that *Proffitt, supra,* found the post-*Furman* Florida Statute, Section 921.141 et seq., Fla.Stat., to be constitutional but urge that the statutes were unconstitutionally applied in petitioner's case. This is double-talk. The statute itself, as was before the *Proffitt* court contemplates the exact situation as occurred here. Their eighth amendment, cruel and unusual punishment, double jeopardy and statutory denial of due process arguments are all foreclosed. *See Proffitt, supra* 428 U.S. at 248–249, 96 S.Ct. at 2965; *Gregg v. Georgia,* 428 U.S. 153, 193–94 n. 44, 96 S.Ct. 2909, 2935 n. 44, 49 L.Ed.2d 859 (1976).

5.

GIVEN THE REPRESENTATION AFFORDED PETITIONER BY HIS TRIAL COUNSEL, PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO THE ASSISTANCE OF COUNSEL AND HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW.

Capital felony trials in Florida have both a "guilt" phase and an "advisory" phase.

*See* Fla.Stat.Ann. 921.141(1) (Supp.1981). At hearing before this Court on July 24, 1979, counsel clearly abandoned any claim that the representation of petitioner at the "guilt" phase of the trial was constitutionally insufficient. *See* TR. of proceedings on motion to stay at 60.

Adequacy of representation at the advisory phase remains for consideration.

Lead counsel for petitioner at both phases was Mr. Lynn Kirkland, now deceased. Mr. Kirkland was a veteran attorney in Polk County, experienced in defending persons charged with crimes. He was privately retained and was assisted at trial by Mr. Donald N. Story who had been an assistant U. S. District Attorney.

In *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) the court held that the sixth amendment guarantee of assistance of counsel was obligatory upon the states in capital cases through the due process clause of the fourteenth amendment and that this assurance contemplated "effective counsel."

In *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975), *cert. denied*, the Fifth Circuit, in an en banc decision, set out standards pursuant to which a reviewing court is to determine whether the assistance afforded an accused by retained trial counsel in a state criminal prosecution is constitutionally sufficient. Specifically, the court held first that the reviewing court must determine whether the representation provided by trial counsel was so deficient as to render the proceedings fundamentally unfair, *Fitzgerald, supra* at 1338. If the reviewing court finds this to be the case, then any conviction must be set aside as violative of the due process clause of the fourteenth amendment. Second, the court held that even if the actions of retained counsel did not result in the trial being fundamentally unfair, if it can be established that either the trial judge or the prosecutor knew the accused was receiving incompetent representation and took no remedial action or if the trial judge or prosecutor directly participated in the incompetency, or if the incompetency of the retained attorney's represen-

tation was so apparent that a reasonably attentive official of the state should have been aware of it and should have corrected it, then the standard in reviewing the constitutional adequacy of the representation is whether trial counsel was reasonably likely to render and did render reasonably effective assistance, *Fitzgerald, supra*, at 1338.

The parameters of "reasonably effective assistance" are found in the 1960 Fifth Circuit case of *MacKenna v. Ellis*, 280 F.2d 592, 599 (5th Cir. 1960), which held:

> We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.

Decision requires consideration of the "totality of the circumstances and the entire record." *See United States v. Gray*, 565 F.2d 881, 887 (5th Cir. 1978).

The guilty verdict was returned by the jury during the late morning of September 28, 1973. IV Trial Transcript 604. Thereafter, the following occurred:

THE COURT: Please be seated. Ladies and gentlemen, as I explained at the first of the trial, we are now operating under a bifurcated or separated system. Your verdict is received, approved and entered.

The second stage of this trial is where you sit in an advisory capacity to the Court and the case is reopened for the admission of testimony touching upon the type of sentence which should be entered under the circumstances.

For you to hear that evidence and to advise the Court by your findings as to what you think is proper.

Now, I would like to send you to lunch. I cannot allow you to be separated at this time. We had made arrangements for 1:00 o'clock and I will ask you to be at ease.

Mr. Walker, will you check and see if cars can be made available and if so—

MR. WALKER: They're on the way now.

THE COURT: They're on the way now? All right. You'll go out to John's Restaurant. I want you to sit together. There will be two bailiffs with you. Although the verdict is in and the trial is over to that extent, we're still in the position where you should not discuss the matter or permit anyone to discuss it in your presence.

(Informal discussion off the record.

The jury left the Courtroom.)

THE COURT: Will the defendant and his Counsel come to the bench?

(The defendant and his Counsel approached the bench.)

THE COURT: Mr. Douglas, you have been found guilty by the verdict of a jury of your peers, the crime of murder in the first degree as charged in the indictment filed in this cause.

Do you have any cause to say why the Court should not adjudge you to be guilty of such offense?

(No response by Mr. Douglas nor his Counsel.)

THE COURT: All right. Its the judgment of this Court that you are guilty of the offense of murder in the first degree as charged in the indictment in this cause and sentence, of course, will be withheld until the second section of the sentencing procedure is completed.

Now, Bailiff, I wish you'd take him to the jail for lunch and we will try to resume here at 1:30.

Will Counsel for State and Defense be ready to proceed at that time?

(Informal discussion off the record.)

THE COURT: All right. Now, gentlemen, this is—I'd like both of you prepared at that time to proceed with testimony as under the statute and we will go from there.

(Informal discussion off the record.)

THE COURT: Do you wish time for motions?

MR. KIRKLAND: Pardon?

THE COURT: Do you wish any motions to be filed? Set 15 days for motions?

MR. KIRKLAND: Yes sir.

THE COURT: Do you have the instructions I propose to give?

MR. KIRKLAND: I have not, Your Honor.

MR. CAMPBELL: No sir.

THE COURT: I would like that back when the hearing is over. If there are objections I will give you an opportunity to express them before I give them.

(Informal discussion off the record.)

[Although the record does not indicate this to be the fact, it seems clear that at this point the jury had returned from lunch and was in the courtroom.]

THE COURT: Ladies and gentlemen, let me say by way of explanation of the proceeding we're entering upon, which is new in our law.

Past statutes were condemned because there had been established in the statutes no standards for consideration or for use by the jury in the determination of this particular matter.

It, at that time, was left solely to the discretion of the jury that unbridled discrimination resulting in, under like circumstances, variances of decision.

To correct that, this particular proceeding has been established and under this, you will be called upon to decide by majority vote of the jury what sentence you wish to recommend to the Court.

Under this statute basic factors are:

1. Whether there are sufficient aggravating circumstances connected with the offense, to justify recommendation of the death penalty and

2. Whether there are sufficient mitigating circumstances in existence which would outweigh the aggravating circumstances and result in recommendation from the jury to the Court of life imprisonment.

As I previously explained, this is a recommendation and the ultimate responsibility is on my shoulders.

Now, at this time, we will proceed on the items which are established as criteria for

your determination and I will give those to you in detail by written instruction at the end of the taking of testimony.

Mr. Campbell, you may proceed, sir.

MR. CAMPBELL: Your Honor, the State moves that the jury be instructed to consider the evidence which was presented in the first portion of this trial as aggravating circumstances, which, under the statute, made this a capital felony especially heinous, atrocious and cruel and that they should consider the testimony in the first trial in their considerations of their determination as to whether or not mercy should be recommended.

Other than that, at this stage, the State has no further presentations to make.

THE COURT: Ladies and gentlemen, this is the law. The evidence which you've heard and found to be worthy of credit and acceptance and belief by you in the first stage of the trial is still within your minds and within your consideration and should be a part of and is a part of the evidence which is available in this second or sentencing stage.

Mr. Kirkland, you may proceed, sr.

MR. KIRKLAND: Ladies and gentlemen of the jury, I don't need to tell you about the shift and I cannot argue the fact____

MR. CAMPBELL: Your Honor, I don't think this is the appropriate time for argument.

THE COURT: This is evidentiary.

MR. KIRKLAND: I'm not arguing.

THE COURT: Well, we're not having opening statement. Let's proceed with evidence and then you may argue at the conclusion.

MR. KIRKLAND: I have no evidence to submit to the Court at this time.

THE COURT: Let me see Counsel up here.

(Counsel approached the bench.)

(Court and Counsel retired to the Conference room.)

THE COURT: As a part of the bifurcated trial the statute establish and limit evidence which the State may offer as to aggravating circumstances. It does not limit the defendant and as I read the statute, it opens up to almost anything that he wishes to offer in mitigation of his offense.

He has been convicted; he may now take the stand to explain his conduct or any excuse that he had for it, his past record, whatever you may conceive, what he can conceive, in a plea for mercy.

MR. KIRKLAND: All right. Now, with the instructions that the Court has presented—and I don't have my notes in front of me—I think there should be an instruction as to emotional state of the mind and disturbance as set forth in the statute, which is not included in the Court's instructions.

THE COURT: I'm going to charge them exactly on the terms of the statute, what they—factors to be considered, but I'm concerned about evidence.

MR. KIRKLAND: Well, let the record show from the hour of 12:30 to 1:30 or 2:00, that the defendant has been unable to obtain any evidence and objects to proceeding at this time with the shortness of notice____

THE COURT: Tell me what evidence you wanted to obtain.

MR. KIRKLAND: I don't know, Your Honor. Let the record show that the attorney for the defendant does not know at this time. He does not know what he could obtain or what he might obtain.

MR. CAMPBELL: Your Honor, this case has been set for trial for a considerable period of time. As a matter of fact, it was continued once at the State's request and there was always a possibility that the defendant would be found guilty of first degree murder and that he would be placed into this position and the statute says what can be presented.

THE COURT: His family are here.

MR. KIRKLAND: Will the Court allow the motion____

Will the Court allow them to hear the mother from the witness stand say well, I don't want my boy to go to the electric chair?

MR. CAMPBELL: I think that's not proper.

THE COURT: Now, that's not----

MR. KIRKLAND: Well, that—Your Honor----

THE COURT: She could testify that he's been a good boy, if that be the case, and, of course, we all know he's----

MR. KIRKLAND: But he hasn't been a good boy.

THE COURT: All right. The State would be permitted to cross examine on that.

MR. KIRKLAND: This is correct. May I ask the Court if he----

THE COURT: Does he—would he---- Have you discussed with him his taking the stand now that he's convicted and trying to explain his actions?

MR. KIRKLAND: No, Your Honor, I have not.

THE COURT: I think that you should.

MR. KIRKLAND: Is Mr. Campbell—do you intend to put his criminal record on or what?

MR. CAMPBELL: I have presented my case.

MR. KIRKLAND: You've presented yours?

MR. CAMPBELL: Yes.

THE COURT: Well, he'll be entitled to come back in rebuttal as in----

MR. KIRKLAND: Well, I know that, Your Honor. If I put the defendant on the stand he's also subject to cross examination.

THE COURT: Well, this is---- You get him and bring him in here.

(The defendant entered the conference room.)

MR. KIRKLAND: May I talk with him a second, Judge?

THE COURT: Yes sir.

(Defense Counsel conferred with his client.)

THE COURT: Mr. Douglas, have a chair. You realize the position you're in. I've talked to your Counsel. I want to make sure that you have the opportunity to present any proper evidence before this jury, because they are sitting there determining whether they wish to recommend a life sentence or death.

Your attorney has concern, fearing to put you on the stand for fear of cross examination as to your past record. I don't know what was in your mind.

The facts have been determined by the verdict of the jury, but if there's any excuse or anything you can offer as justification or anything for—to justify them recommending mercy, that is your opportunity.

The Court cannot advise you what to do. I don't know the facts. I do know, because I obtained a copy of the record and presented it to your attorney while the jury was deliberating, to aid you in preparing for this stage of the trial if this eventuality did come to pass.

Your family are here. I don't want you to say anything here before me, because in ultimate analysis, I have the responsibility of that, so I want to make sure that you have every opportunity to present any evidence which you may have tending to mitigate this crime.

Now, I'm going to step out. We've had this time. Do you want any of—members of his family brought in here, Counsellor?

MR. KIRKLAND: Don't want any of your family in here? No, Your Honor. Let the record reflect that the defendant does not wish to have any members of his family brought in.

THE COURT: How long would you like to discuss this with him?

MR. DOUGLAS: I don't want to take the stand.

THE COURT: Do you realize this is your right under the constitution and the laws?

MR. DOUGLAS: Yes sir, I do.

THE COURT: And its a valuable right you're giving up?

MR. DOUGLAS: Yes sir.

THE COURT: Well, I won't inquire why; that's none of my business.

MR. KIRKLAND: You can take him out now. I'd like a further conference with the Court and Mr. Campbell.

THE COURT: All right, sir.

(The defendant left the conference room.)

MR. KIRKLAND: I'm not completely familiar with a proceeding like this. This is the first I've ever been involved in.

THE COURT: Its the first any of us have in this Circuit.

MR. KIRKLAND: All right. Now, when we get to the next question, before we get in a hassle out in open Court, as I read the statute, I can tell everybody why I think the death penalty shouldn't be applied.

THE COURT: Yes sir.

MR. KIRKLAND: For moral reasons as well as the reasons as set forth in that statute.

THE COURT: I'll permit you to make your argument.

MR. KIRKLAND: I mean, I don't want to get in an argument with the Court and I don't understand the statute, Judge, and I don't____

THE COURT: Well, Counsel, I don't think you agree, but I think this—the purpose of this statute is to—as I see it—to provide some standards.

As you know, in the past, the death penalty has been inflicted in varying degrees; its been left purely to the discussion of the jury and this statute is designed to establish standards.

To bring some order, some logic and reason out of this determination. I will permit you to argue. I think you are bound by the rules of evidence.

MR. KIRKLAND: That's the point, Your Honor, where I have my concern. As I recall the statute, somewhere along the lines in there they say in general conformity with the rules of evidence.

THE COURT: Well, we release them. There's an opportunity even for hearsay, provided there's an opportunity to get it. There, the rules are fairly well relaxed, but at the same time you're basically confined to evidence.

You can't get up there and testify to the jury as to what happened on this occasion.

MR. KIRKLAND: That's true.

THE COURT: We must accept the fact____

MR. KIRKLAND: I recognize____

THE COURT: ____this is murder____

MR. KIRKLAND: ____that they found him guilty as charged.

THE COURT: ____and you can plead with them, with human life involved.

MR. CAMPBELL: But you can't go out____

MR. KIRKLAND: I realize I can't touch on the testimony. Now, may I ask this: What is the procedure of argument?

THE COURT: Be the same as in the trial.

MR. KIRKLAND: Same as in the trial. Whenever you've made your opening argument. Is that correct?

MR. CAMPBELL: I've made no argument; I just told the Court that I was presenting no other tesitmony except that that's there and asked the Court to instruct them to consider that testimony. Our argument is concluded unless some testimony is offered.

MR. KIRKLAND: I have none. For the purpose of the record____ This man will appeal, I'm sure.

MR. CAMPBELL: Well, its required.

MR. KIRKLAND: I'm talking about after that.

____that the attorney for the defendant objects to the entry of the proceedings supposed—commenced at 2:00 o'clock, after a verdict rendered at 12:30, on the grounds that he did not have ample time to either investigate or prepare for any such argument, evidence, or otherwise, as might be presented in behalf of the defendant for mitigation.

THE COURT: Counsellor, do you have witnesses you want called which have not been made available here? I think this is something that should have been contemplated as to the nature of the charge.

The provision of this statute, as early as practicable this procedure will be handled and when we can get these 12 jurors back, of course, is a practical problem.

If you assure me that you do have in mind testimony you wish to submit in his behalf and when that can be available, then I'll certainly entertain a motion for a continuance.

MR. KIRKLAND: Well, let the record state that Counsel for the defense, as stated previously, due to the shortness of notice is not aware of any witnesses that he might call; he's not aware of any evidence that he might present____

THE COURT: Have you discussed this with your client?

MR. KIRKLAND: Briefly, yes, Your Honor.

THE COURT: But you say he doesn't have anybody to suggest to you?

MR. KIRKLAND: At this____ Let the record reflect, at this particular point, there's been a short discussion with the client and due to the shortness of time that neither the client nor his attorney is prepared to offer anyone.

THE COURT: Well, you get with your client right now and if he's got some names of witnesses he can tell you he would like to have testify in his behalf in this continuing procedure, then I would grant a reasonable continuance to do so.

MR. KIRKLAND: Well, Your Honor, I'll get with him.

THE COURT: Then why shouldn't we proceed?

MR. KIRKLAND: Well, naturally I'm going to object, Your Honor.

THE COURT: Well, I know, but if you can tell me there are witnesses you want to____

MR. KIRKLAND: I cannot assure this Court of any witness; I have no witness; I know of no witness____

THE COURT: ____and your client can't tell you of any witness.

MR. KIRKLAND: ____and my client can tell me of no witness.

THE COURT: All right. Then I see no recourse except to proceed. Now, if you're going to offer no testimony, it boils down to an argument.

MR. KIRKLAND: Yes sir.

THE COURT: How long do you want for argument?

MR. KIRKLAND: There's not exactly a lot that I can say. How long do you want; ten minutes?

MR. CAMPBELL: On, I'd say 15 to 20 minutes. I'm not going to argue long. I don't—just don't know; I've never been through this kind before.

MR. KIRKLAND: Judge, I'm at a loss. I really don't know what to do in this type of proceeding. If I'd been through one, I would, but I've never handled one except this time.

THE COURT: I think you've got the right to get up there and talk this is a human life.

MR. KIRKLAND: Well, that's the only thing I can say.

THE COURT: And he'll have the right to come back and say____

MR. KIRKLAND: ____that he took a human life.

THE COURT: And show him the same mercy that he showed this man.

(Informal discussion off the record.)

(Court and Counsel returned to the Courtroom.)

THE COURT: Mr. Kirkland, do you wish to present any witnesses?

MR. KIRKLAND: I have none, Your Honor.

THE COURT: Gentlemen, I'll permit you to argue to the jury on this particular phase of the proceeding.

MR. CAMPBELL: May I proceed, Your Honor?

THE COURT: Yes sir.

After argument of both counsel and further instructions by the court the jury returned its verdict recommending that a life sentence be imposed.

Petitioner urges that Mr. Kirkland did not understand the Florida Statutory scheme of bifurcated trials, that he was unprepared and did not render reasonably effective assistance to petitioner at the sentencing stage. His counsel counters the suggestion that results obtained, i. e. a recommendation against imposition of the death penalty, are not to be considered since the petitioner's failure to offer evidence to the jury at the advisory phase of the trial deprived the judge of facts which might have been found by him to be mitigating.

Florida's bifurcated procedure in capital felony trials, Fla.Stat.Ann. § 921.141 et seq. (Supp.1981), became effective December 8, 1972. *State v. Dixon*, 283 So.2d 1 (Fla. 1973), was decided July 26, 1973, with rehearing denied October 10, 1973. *Id.* There a panel of the Florida Supreme Court upheld the constitutionality of Section 921.-141, Fla.Stat., and discussed in detail strategy and procedure thereunder.

■ The record does not indicate whether Mr. Kirkland was familiar with *Dixon* at the time of the trial in this case. No one asked him at any post-trial hearing and he died in 1977. Prior to the proceeding in this Court, Mr. Kirkland's several statements to the effect that he was not "completely familiar with a proceeding like this" and that "I don't understand the statute" cannot be taken at face value. The record indicates that this was the first capital felony case tried in Polk County under the new statute. Experience indicates that some people depreciate their own knowledge and ability as a trial tactic for persuasive reasons. Examination of the entire record indicates that as a matter of fact Mr. Kirkland provided effective and competent counsel under the circumstances. With the patient and entirely fair procedure followed by the trial judge Mr. Kirkland did talk with the petitioner several times between the guilt and penalty stages of the trial. All the known witnesses, including several friends of petitioner had testified during the "guilt" stage of the trial, the petitioner made it clear that he did not want to testify and did not want

his mother to testify. As Mr. Kirkland said to the judge during the chambers colloquy, IV Trial Transcript 612, "Mr. Kirkland: But he (the petitioner) hasn't been a good boy." Even hindsight would not allow a finding that counsel's failure to call any witnesses during the penalty stage was the result of anything other than the lack of exculpatory evidence. The claim that the failure to present evidence at that time prevented the judge from considering mitigating factors overlooks the later sentencing procedure involving as it did a presentence report and allocution by petitioner and his counsel. Clearly this claim is insubstantial.

Representation of petitioner at all stages of his trial was fundamentally fair.

6.

THE FAILURE TO ACCORD PETITIONER ADEQUATE NOTICE OF THE AGGRAVATING CIRCUMSTANCES UPON WHICH THE DEATH PENALTY WAS SOUGHT DEPRIVED HIM OF HIS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.

■ This claim was clearly and effectively waived and abandoned by counsel for petitioner at the July 24, 1979 Motion to Stay hearing in this Court. *See* Transcript of Hearing on Motion to Stay 4.

CONCLUSION

Having found that none of petitioner's claims are substantiated in the constitutional sense and upon full consideration to be without merit, petitioner's 28 U.S.C. § 2254 habeas corpus petition should be and it is DENIED in all respects.

The Clerk is directed to enter judgment dismissing the petition with prejudice.

Petitioner has indicated an intention to appeal an adverse ruling in this Court and has filed an Application for Certificate of Probable Cause pursuant to 28 U.S.C. § 2253 which is opposed by respondent. By separate order entered concurrently such a certificate will be issued.

The stay of execution heretofore entered herein is CONTINUED until September 15, 1981, and if an appeal is filed by that date, thereafter continued until dissolved by an appellate court.