**Howard Virgil Lee DOUGLAS,**
**Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Secretary, Florida Department of Offender Rehabilitation, and David H. Brierton, Superintendent of Florida State Prison at Starke, Florida, Respondents-Appellees.**

No. 81–5927.

United States Court of Appeals,
Eleventh Circuit.

Sept. 19, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 21, 1983.

Larry Helm Spalding, Sarasota, Fla., Steven M. Goldstein, Assoc. Prof. Fla. State Univ., Tallahassee, Fla., for petitioner-appellant.

Alan Ellis, Philadelphia, Pa., for amicus curiae Nat. Ass'n of Criminal Defense Lawyers.

Louis G. Carres, Public Defender, West Palm Beach, Fla., for amicus curiae Florida Public Defenders Ass'n.

Richard W. Prospect, Asst. Atty. Gen., Daytona Beach, Fla., for respondents-appellees.

Before RONEY and KRAVITCH, Circuit Judges and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Howard Virgil Lee Douglas was convicted by a Florida state court of murder in the first degree. In the second phase of a bifurcated trial, the jury unanimously recommended life imprisonment, rejecting imposition of the death penalty. The trial judge, however, found that the murder was "especially heinous, atrocious and cruel," that "no evidence of mitigating circumstances was produced," and imposed the death penalty. The conviction was affirmed by the Florida Supreme Court in *Douglas v. State,* 328 So.2d 18 (Fla.) (Douglas I), *cert. denied,* 429 U.S. 871, 97 S.Ct. 185, 50 L.Ed.2d 151 (1976), *reh. denied,* 429 U.S. 1055, 97 S.Ct. 770, 50 L.Ed.2d 771 (1977). The Florida Supreme Court affirmed the denial of a subsequent motion for state post-conviction relief but issued a stay of execution. *Douglas v. State,* 373 So.2d 895 (Fla.1979) (Douglas II). Douglas then petitioned for federal habeas relief pursuant to 28 U.S.C. § 2254. The federal district court denied the habeas corpus petition in all respects. *Douglas v. Wainwright,* 521 F.Supp. 790, 807–08 (M.D.Fla. 1981).

We affirm in part and reverse in part and remand.

### I. *Background*

Appellant was convicted of the murder of Jesse Atkins. The motive apparently arose from a classic "love triangle" in which Helen Atkins ("Atkins"), wife of the deceased, had been romantically involved with appellant, having lived with him for a year prior to her marriage to Mr. Atkins. She and her husband were frequently separated and Atkins and Douglas maintained contact during that period.

On the afternoon of July 16, 1973, twenty year old Atkins and her husband drove to Bowling Green, Florida to collect belongings from a trailer Atkins rented and from which her eviction was threatened. On the return trip to Fort Green, appellant drove up beside the Atkins and ordered them to pull to the side of the road. Appellant, armed with a rifle, got into their car and ordered them to proceed according to his directions. During this trip the car became stuck on a back road. All three walked to a nearby mining operation where a man was found who returned with a truck to extricate the car. The three then drove to a wooded area near Brewster, Florida.

Appellant at gun point forced the victim and Atkins to undress and perform sexual acts, and then struck Mr. Atkins on the head with his rifle, shattering the rifle stock. Appellant next fired multiple shots into the victim's head.

According to Atkins, she and appellant drove away in the Atkins' car until it again stalled. Appellant then directed Atkins to engage in sexual activities with him. Following this they walked several miles to where appellant's truck was parked and drove to the trailer home of Atkins' mother-in-law to pick up her two children. Atkins testified that she did not tell her deceased husband's parents about the murder because of appellant's threats to kill them all. Atkins, Douglas and the children all returned to the scene of the murder where Atkins and Douglas dragged the body into some underbrush and covered it. They then started the Atkins' automobile which Atkins drove away. Douglas followed driving his own truck. Atkins and her children lived with Douglas at her trailer for nine days following the murder, until authorities independently discovered Mr. Atkins' body.

Douglas was indicted on charges of first degree murder, tried by a jury and convicted. At trial, Atkins, as the only eyewitness to the crime, was the prosecution's key witness. During her testimony, on motion by the state and over the objection of defense counsel, the judge excluded the general public from the courtroom. The families of the defendant, the witness, and the decedent and members of the press were allowed to remain.

At the sentencing phase of the bifurcated trial, the jury recommended imposition of a life sentence. After taking the sentence under advisement for ten weeks, the trial judge issued an order of Judgment and Sentence, adjudging appellant guilty and imposing the death penalty. Before imposing sentence the trial judge requested and received a presentence investigation report to be used to identify any mitigating circumstances. The presentence report on which the court relied identified several prior felony and misdemeanor convictions of appellant. All but one of the felony convictions previously had been invalidated because they were "uncounseled convictions" imposed in disregard of appellant's right to counsel.

## II. *Public Trial Issue*

Douglas contends that his sixth and fourteenth amendment right to a public trial, as applied to the states through the fourteenth amendment, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), was violated by the exclusion of members of the general public from the courtroom during the testimony of Atkins, who was the prosecution's key and only eyewitness to the crime. Conceding that the right to a public trial is not absolute and that it must, in some instances, be balanced against other competing societal interests, appellant argues alternatively that even if the exclusion did not violate his public trial right per se, the trial judge's failure to hold a hearing on the exclusion motion or to make findings as to the necessity for the closure violated appellant's sixth amendment right.

Immediately prior to Atkins' testimony concerning the events leading up to and following the death of her husband, the state moved for the exclusion from the courtroom "of all except necessary Court personnel." *Douglas v. Wainwright,* 521 F.Supp. 790, 795 (M.D.Fla.1981). The colloquy between the parties was as follows:

MR. CAMPBELL: I am making a motion that due to the nature of the testimony of the next witness, Helen Atkins, that the Court order that the Courtroom be cleared of all except necessary Court personnel.

MR. KIRKLAND: The Defense will object, because she's not a person of young and tender years. There are ladies on the jury that are going to have to hear this and I think she should confront society with her testimony as well.

I think the Defendant has a right to a fair trial and to a public trial.

MR. CAMPBELL: Your Honor, I think that regardless of whether she's a person of young and tender years—I'm not sure how far that goes . . .

THE COURT: Let me see you gentlemen up here. (Counsel approached the bench.)

THE COURT: Do you feel that this is so embarrassing to her . . .

MR. CAMPBELL: It could be, Your Honor.

THE COURT: . . . do you feel this is embarrassing to her or are you trying to save the women in . . .

MR. CAMPBELL: I think its not only embarrassing to her, Your Honor, I think that it's such that I don't see any reason for some of the people in the audience to sit and listen to this sort of testimony, as I've indicated to the jury.

I don't see any reason that anybody ought to hear it unless it's absolutely necessary.

THE COURT: Is [sic] there any members of the Defendant's family in the audience?

MR. CAMPBELL: Yes, Your Honor.

THE COURT: How many?

MR. KIRKLAND: One or two.

THE COURT: Is the Press here?

MR. KIRKLAND: I assume there are members of the Press.

*Id.* at 795, quoting II Trial Transcript 213–14. The judge then instructed the jury:

THE COURT: Ladies and gentlemen, a motion has been made that the—due to the nature of the testimony as anticipated by the State to be produced—that the Courtroom be cleared of all personnel who are not part of the official actions in this case.

Our Constitution and laws provide for a public trial and this is the right of every individual. I wish to assure the guarantee of a public trial and I will permit members of the family of the Defendant here. . . .

MR. CAMPBELL: Then you ought to also permit the members of the family of the deceased.

THE COURT: . . . and the members of the family of Jessie William Atkins, Jr. . . .

MR. CAMPBELL: _____ and Helen Atkins.

THE COURT: . . . and Helen Atkins and the representatives of the Press. Other than that, I would like everyone else to leave and—until this phase of the case has been completed. (The spectators left the Courtroom.)

*Id.* at 793–94, quoting II Trial Transcript 214–15.

The United States Supreme Court has never specified whose presence, at a minimum, must be allowed to ensure a defendant a constitutionally guaranteed public trial.[1] *But see In re Oliver,* 333 U.S. 257, 259, 68 S.Ct. 499, 500, 92 L.Ed. 682 (1948) (conviction for contempt with only judges and perhaps staff members and prosecutor present violates right to public trial). However, Justice Harlan, in his concurring opinion in *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), stated:

Essentially, the public trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings. A fair trial is the objective, and "public

---

1. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." Amendment VI, United States Constitution.

trial" is an institutional safeguard for attaining it.

Thus, the right of "public trial" is not one belonging to the public, but one belonging to the accused and inhering in the institutional process by which justice is administered. Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the "public" will be present in the form of those persons who did gain admission. Even the actual presence of the public is not guaranteed. A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process.

*Id.* at 588–89, 85 S.Ct. at 1662–63 (citations omitted).

Beyond this, even though the Supreme Court has in several cases addressed the contours of the first amendment right of the public and press to attend criminal proceedings, *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspaper, Inc. v. Commonwealth of Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), the Court has not spoken on the proper approach to issues raised when a criminal defendant alleges his sixth amendment right to a public trial has been violated. We interpret the Court's analysis in the first amendment right of access cases, however, as helpful to the analysis of a claim of deprivation of a sixth amendment right to a public trial. *See Globe Newspaper Co. v. Superior Court, supra; Richmond Newspapers, Inc. v. Virginia, supra; Gannett Co. v. DePasquale, supra.*

In *Aaron v. Capps,* 507 F.2d 685, 687–88 (5th Cir.1975), the only binding precedent in this circuit on the issue before us,[2] the court's decision that the defendant was not deprived of a public trial was based primarily on the fact that, in the particular circumstances, the presence of certain persons sufficed to preserve the public nature of the proceedings. In the words of the court: "[T]he fact that some members of the public were barred from the courtroom does not necessarily mean that a denial of a public trial has occurred; the 'decision must turn on the particular circumstances of the case, and not upon a question-begging because abstract and absolute right to a "public trial" [sic]'." *Id.* at 687, *quoting Levine v. United States,* 362 U.S. 610, 616–17, 80 S.Ct. 1038, 1042–43, 4 L.Ed.2d 989 (1960).

In *Aaron,* the general public was excluded during a rape trial.[3] The relatives of both the defendant and the victim, the defendant's clergyman, courtroom personnel, all attorneys and the press were allowed in the courtroom. *Id.* The court held there was no violation of the public trial right because: "some members of the public were admitted; the courtroom was at least three-fourths full; the transcript of the trial became public record. Particularly important is the fact that the news media were admitted. The published reports of the trial were lengthy and complete. The defendant's relatives and clergymen were present to provide moral support and comfort to the accused." *Id.* at 687–88. The court determined that the presence of these persons, combined with the actual press coverage of the trial, adequately served the purposes underlying the public trial right, *id.,* and the " 'defendant receive[d] every safeguard insured by a trial open to the general public.' " *Id.* at 688, *quoting* Note, 45 Mich.L. Rev. 474, 479 (1937).

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) this circuit adopted as precedent the decisions of the former Fifth Circuit.

**3.** The exclusion order was made pursuant to Article VI, Section 169 of the Alabama Consti-

tution of 1901, which was repealed in 1973, and read: "In all prosecutions for rape and assault with intent to ravish, the court may, in its discretion, exclude from the courtroom all persons, except such as may be necessary to the conduct of the trial."

Relying on *Aaron v. Capps,* therefore, we should consider whether in the proceedings in question the purposes underlying the constitutional mandate of a "public" trial are met, even though certain persons are not present or allowed to be present. In other words, the practical impact of the partial closure must be evaluated. *Id.*

■ Prior to the recent Supreme Court decisions on the first amendment right of access, several of the United States Courts of Appeals decided that a defendant's right to a public trial was not violated when the closure was partial, in that family members and/or the press were allowed to remain, and the exclusion of the public was narrowly limited in scope to a legitimate purpose for which it is ordered. *United States ex rel. Latimore v. Sielaff,* 561 F.2d 691, 694–96 (7th Cir.1977) (to protect dignity of witness in rape trial); *United States v. Eisner,* 533 F.2d 987, 993–94 (6th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976) (to protect witness with fear of testifying in public); *United States ex rel. Bruno v. Herold,* 408 F.2d 125 (2d Cir.1969) (to protect witness afraid of testifying); *United States ex rel. Orlando v. Fay,* 350 F.2d 967 (2d Cir.1965), *cert. denied sub nom. Orlando v. Follette,* 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1966) (to protect witnesses from intimidation); *Geise v. United States,* 262 F.2d 151, 155 (9th Cir. 1958), *cert. denied,* 361 U.S. 842, 80 S.Ct. 94, 4 L.Ed.2d 80 (1959) (to protect child witnesses in rape trial from embarrassment). Others held that even where the closure is total and the press and family members, as well as the general public, are excluded, but only for a limited, justifiable purpose and period of time, the public trial guarantee is honored. *United States v. Hernandez,* 608 F.2d 741, 747–48 (9th Cir.1979) (to protect witness and his family where safety threatened); *United States ex rel. Lloyd v. Vincent,* 520 F.2d 1272, 1274 (2d Cir.), *cert. denied,* 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975) (to preserve confidentiality of undercover agents in narcotics case); *Stamicarbon, N.V. v. American Cyanamid Co.,* 506 F.2d 532, 539–42 (2d Cir.1974) (to protect from disclosure of trade secrets).

*But see United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 607–08 (3d Cir.1969) (writ of habeas granted because exclusion of public did not meet "standard of strict and inescapable necessity" where jury had retired from courtroom for hearing on suppression of evidence and only purpose of exclusion was to protect the defendant); *United States v. Kobli,* 172 F.2d 919 (3d Cir.1949) (conviction reversed where exclusion of public for protection of public morals swept too broadly; exclusion of only youthful spectators would have been appropriate); *Tanksley v. United States,* 145 F.2d 58 (9th Cir.1944) (conviction reversed where only press, necessary courtroom personnel and family members allowed throughout the trial).

Thus the law is clear that the right to a public trial is not absolute and must in some instances give way to other substantial interests essential to the fair administration of justice. *United States v. Hernandez,* 608 F.2d at 747; *United States ex rel. Latimore v. Sielaff,* 561 F.2d at 694; *United States v. Eisner,* 533 F.2d at 993; *United States ex rel. Lloyd v. Vincent,* 520 F.2d at 1274; *Geise v. United States,* 262 F.2d at 156–57. *See Aaron v. Capps,* 507 F.2d at 687; *Lacaze v. United States,* 391 F.2d 516, 521 (5th Cir.1968). *See also* Note, *The Accused's Right to a Public Trial,* 42 Notre Dame Lawyer 499, 503–04 (1967); Note, *The Right to a Public Trial in Criminal Cases,* 41 N.Y.U.L.Rev. 1138, 1144–47 (1966).

■ The recent Supreme Court right of access cases make equally clear, however, that one who seeks to justify closure of a criminal trial carries a heavy burden. *Globe Newspaper Co. v. Superior Court,* 457 U.S. at 606–07, 102 S.Ct. at 2620 (where the state obtains exclusion of the public and the press and press asserts a first and fourteenth amendment right of access to criminal trials, closure must be justified by "a compelling governmental interest, and [be] narrowly tailored to serve that interest"); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 581, 100 S.Ct. at 2829 (opinion of Burger, C.J., White & Stevens, JJ.) (where

court, without objection from prosecutor or defendant, seeks closure and press asserts first and fourteenth amendment right of access, closure is unjustified "[a]bsent an overriding interest articulated in findings"); *id.* at 598, 100 S.Ct. at 2839 (Brennan & Marshall, JJ., concurring in judgment); *id.* at 600 & n. 5, 100 S.Ct. at 2840 & n. 5 (Stewart, J., concurring in judgment). *See also Newman v. Graddick,* 696 F.2d 696 at 801 (11th Cir.1983) ("compelling governmental interest" and findings required to close civil proceeding relating to release or incarceration of prisoners). It would be extremely ironic to require less of a showing when the basis for opposing closure is a defendant's explicit sixth amendment right to a public trial than when the interest asserted is the press' unexplicit first amendment right of access to criminal trials. Equally ironic would be a holding that when a state seeks closure it has a lesser burden than a defendant who seeks closure to protect his right to a fair trial. *See, e.g., United States v. Powers,* 622 F.2d 317, 324 (8th Cir.1980) (where defendant seeks closure to ward off undesired publicity and state objects, defendant must show that closure is justified by strict and inescapable necessity). *Cf. Nebraska Press Association v. Stuart,* 427 U.S. 539, 553–65, 96 S.Ct. 2791, 2800–05, 49 L.Ed.2d 683 (1976) (use of prior restraint of press to protect defendant's right to fair trial prohibited where alternatives to restraint of press will suffice).

What emerges from a review of these cases is the conclusion that the strength of the reason for the closure is another factor properly to be considered in determining whether the right to a public trial has been violated.[4]

 Whether a particular proceeding therefore is sufficiently "public" to pass constitutional muster "must turn on the particular circumstances of the case,"[5] *Aaron v. Capps,* 507 F.2d at 687. In particular the court must analyze, in light of those purposes of the public trial guarantee which the defendant alleges were undermined, *see Gannett Co. v. DePasquale,* 443 U.S. at 383, 99 S.Ct. at 2907; *Douglas v. Wainwright,* 521 F.Supp. at 795, the scope and practical impact of the partial closure, *Aaron v. Capps,* 507 F.2d at 687–88, and the strength of the reason for the closure. *See* Note, *The Accused's Right to a Public Trial,* 42 Notre Dame Lawyer 499, 499–504 (1967). This approach allows a distinction to be drawn between some proceedings where closure is partial, in that certain members of the public are allowed to remain, and those in which total exclusion is ordered. Total exclusion is proscribed absent a most compelling justification. *Cf. Globe Newspaper Co. v. Superior Court, supra* 102 S.Ct. at 2620. In other cases, where neither all members of the public nor the press are excluded, the "public" nature of the proceedings may be retained sufficiently so that a lesser justification for the partial closure will suffice to avoid constitutional deprivation. In those partial closure cases where the interests underlying the public trial right are not protected, however, a

---

**4.** In *Aaron v. Capps, supra,* little attention was devoted to the sufficiency of the justification for the closure. There, however, as noted *supra* n. 3, the closure was ordered pursuant to a state constitutional provision, the federal constitutionality of which was not directly challenged. Subsequent to the decision in *Aaron v. Capps,* the right of access decisions of the Supreme Court and of this circuit have made clear that the reason for the closure is a critical factor that must be considered in order to justify closure. *Cf. United States v. Juarez,* 573 F.2d 267, 281 (5th Cir.1978) (exclusion of defense witnesses during closing arguments and jury charge, pursuant to Fed.R.Evid. 615 "was reasonable" due to concern that witnesses might be called at a second trial and given

these proceedings were totally open to the general public).

**5.** As expressed by another federal court: "Ordinarily the Sixth Amendment precludes the general exclusion of the public from the trial of a case over the objection of the defendant ... [h]owever, ... although the Constitutional right of public trial is a substantial one, the term 'public' is a relative one, and its construction depends upon various conditions and circumstances...." *United States v. Geise,* 158 F.Supp. 821, 824 (D. Alaska 1958), *quoted with approval and aff'd, Geise v. United States,* 262 F.2d at 156–57.

compelling justification for the closure, as in total closure cases, must be shown.

### A. Purposes of The Public Trial Guarantee

The Supreme Court in *Gannett Co. v. DePasquale,* 443 U.S. at 383, 99 S.Ct. at 2907, reviewed the interests protected by the public trial right: "Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system." *See also Globe Newspaper Co. v. Superior Court,* 457 U.S. at 605–06, 102 S. Ct. at 2619–20; *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 569–73, 100 S.Ct. at 2823–25 (Burger, C.J., White & Stevens, JJ.); *id.* at 593–97, 100 S.Ct. at 2836–38 (Brennan & Marshall, JJ., concurring in judgment). In the habeas proceeding below, the district court accurately summarized the purposes underlying the right which potentially are implicated in this case: "(1) [protection from] the dangers of secret proceedings (2) open proceedings give notice to the world of the details of the case, thus encouraging potential and previously unidentified witnesses to volunteer their knowledge, and (3) the likelihood that more truthful testimony will result if given in open court in the presence of the public." *Douglas v. Wainwright,* 521 F.Supp. at 795.

Appellant does not argue that the trial was in any way "secret" in the sense of being a "Star Chamber" proceeding:[6] the exclusion order was narrowly tailored to apply during the testimony of one witness only, some members of the public were in attendance, the press was allowed to be present, and the transcript of the testimony

was made public, precluding any basis for a claim that the dangers of secret proceedings were present.[7] Thus, our analysis must be undertaken within the framework of the other purposes of the public trial right which the appellant asserts and the lower court determined were relevant here: encouragement of unidentified witnesses to come forward and the likelihood of more truthful testimony absent the exclusion. If, on the particular facts of this case, *Aaron v. Capps,* 507 F.2d at 687, these interests were adequately protected by the nonexclusion of the press and family members, then a less "compelling" justification will suffice for the proceedings to qualify as "public" for purposes of the sixth amendment guarantee.

Here, given that Atkins was the sole eyewitness to the murder and the witness on whose testimony the judge relied in finding the one aggravating circumstance used to justify imposition of the death penalty, her testimony was crucial to say the least. The record reveals that the witness had remained with the appellant for nine days after the death of her husband. Only when the body was discovered did Atkins notify anyone of the murder. Appellant did not testify at trial, but his attorney(s) at trial, on appeal, and in the habeas proceedings have suggested indirectly that Atkins was herself implicated in the crime. Although there is no direct evidence in the record to support this, the possibility remains that some unidentified person may have witnessed events relating to the killing but, for a variety of imaginable reasons (e.g., a desire not to get personally involved) had not come forward at the time of trial. If, however, such a person had attended the trial and heard testimony being given by Atkins which was contrary to what he had wit-

---

6. Even Justice England who dissented on this issue in the Florida Supreme Court and would have reversed Douglas' conviction for violation of the public trial right said: "We do not have here the classic nonpublic trial which our jurisprudence has abhorred since the nation was founded. I agree with the majority there was no 'Star Chamber' or 'Inquisitorial' proceeding . . . ." *Douglas I,* 328 So.2d 18, 22 (1976) (England, J., dissenting).

7. We make no ruling as to whether the dangers of a secret proceeding could be present in the event of a more broad exclusion order, where a partial closure is in effect during more of the trial than the testimony of one witness, where total closure is ordered, or where the transcript is not made public.

nessed, he may have been compelled to come forward. This is the type of situation against which protection is to be afforded by the public trial right and which is alluded to in the second purpose of the right identified by the court below.

The third purpose of the public trial right pinpointed by the lower court, inducing truthful testimony by the witness, also is implicated in this case. Atkins may have revealed to another person a version of the events of the day of and the week following the killing inconsistent with her testimony at trial. Even if such a revelation would constitute excludable hearsay, the knowledgeable member of the public could have informed defense counsel of any inconsistency. Cross-examination, therefore, could have been enhanced.

The foregoing scenarios are speculative and hypothetical only, and are not the only ones imaginable. There is not necessarily any way a defendant denied the right to a public trial could prove the validity of such hypotheses. For precisely this reason, the federal courts consistently have refused to require a defendant to prove prejudice once a violation of the right to a public trial is shown. *United States v. Hernandez,* 608 F.2d 741, 747 (9th Cir.1979); *Martineau v. Perrin,* 601 F.2d 1196, 1198 (1st Cir.1979); *United States v. Eisner,* 533 F.2d 987, 993 (6th Cir.1976); *United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 608 (3d Cir. 1969); *Davis v. United States,* 247 F. 394, 398 (8th Cir.1917). It is "the settled rule of the federal courts that a showing of prejudice is not necessary for reversal of a conviction not had in public proceedings." *Levine v. United States,* 362 U.S. 610, 627 n. 1, 80 S.Ct. 1038, 1048 n. 1, 4 L.Ed.2d 989 (1960) (Brennan & Douglas, JJ., dissenting from a finding that failure to object to closure waives right to public proceedings). "To require proof of [prejudice] by the defendant would be ironically to enforce against him the necessity to prove what the disregard of his constitutional right has made it impossible for him to learn." *United States ex rel. Bennett v. Rundle,* 419 F.2d at 608; *see also, United States v. Hernandez,* 608 F.2d at 747 ("To require the accused to establish prejudice because of the exclusion would impair or destroy the safeguard").

### B. *Scope and Practical Impact of the Exclusion*

Having identified the interests in a public trial that were implicated by the partial closure during Atkins' testimony, we proceed to analyze, in light thereof, the scope and practical impact of the closure.

The partial exclusion was limited to the testimony of one witness only. *See Globe Newspaper Co. v. Superior Court,* 457 U.S. at 607, 102 S.Ct. at 2620 (closure order must be narrowly tailored). As discussed above, however, that one witness was central to the prosecution's case. Moreover, the order required exclusion of all of the general public, not only youthful spectators. *See United States v. Kobli,* 172 F.2d 919 (3rd Cir.1949) (conviction reversed where exclusion of public, not only youthful spectators, for protection of public morals swept too broadly).

In *Aaron v. Capps,* 507 F.2d at 687, the practical impact of the partial closure was mitigated by virtue of "the fact that the news media were admitted [and] [t]he published reports of the trial were lengthy and complete." The record in *Aaron v. Capps* also reflected that even though the public at large was excluded, "the courtroom was three-fourths full...." *Id.*

All that the public trial guarantee affords to the defendant is that the public be *allowed* to be present, not that the public actually be present. *See Estes v. Texas,* 381 U.S. at 588–89, 85 S.Ct. at 1662–63 (Harlan, J., concurring). Simply *allowing* the press to be present, however, does not serve the same purpose as allowing the public to be present, for the press is not the public, and the Sixth Amendment guarantees a *public* trial. It is only as a fiduciary for the public that the presence of the press mitigates against what otherwise would be a closed, non-public trial. Thus, in certain cases, the presence of the press has been held to safeguard the public trial right, the press serving as a fiduciary for the public, not because they were *allowed* to be

present, but because they were present and reported the trial activities and informed the public of that which the public was unable to experience first-hand because of the closure order. *Aaron v. Capps,* 507 F.2d at 687–88. It does not follow logically that because the Sixth Amendment requires only that the *public* be *allowed* to be present that where the public is excluded but the ·*press* is *allowed* to remain the Sixth Amendment right is not infringed. If the press is not actually acting as a fiduciary for the public, then a partial closure is no different than an absolute closure, requiring a most "compelling interest" to justify it. The determination of the degree of press coverage, therefore, is necessary to a determination of the extent to which the public trial was infringed. These assessments in turn are relevant to the strength of the governmental interest essential to justify the closure order.

During the Motion to Stay Hearing in the court below, the district judge stated: "I am concerned as a result of one contention which was raised, and that is that the principal witness may not have testified to some of the things she testified to if she had had to testify in the presence of the public." [8] He concluded, however, that one of the purposes underlying the sixth amendment, that a witness face the defendant in front

of her peers, "was satisfied ... when this witness, the principal witness, was required to testify *in the presence of the press* and, in this instance, the press, in my judgment, was the saving factor, *being present,* because as might be expected, *they published it."* [9] Likewise, in the opinion denying habeas relief, the district court stated: "Certainly the newspaper reporters present guaranteed that there was no secret trial and gave notice of the trial details to the community." *Douglas v. Wainwright,* 521 F.Supp. at 795.

■ While there is little evidence to support the conclusion that the press was present and reported the details to the community, we cannot say the finding is clearly erroneous.[10] In response to the court's inquiry at the time of the motion for exclusion, defense counsel stated: "I assume there are members of the Press [present]." [11] Appellant does not now argue that the press was not present or did not report the testimony.[12]

■ The presence of the press and family members during Atkins' testimony helps mitigate any undermining of the purposes of the public trial right that are implicated in this case. Press coverage reduces the danger that an unidentified witness to any of the events surrounding the crime would

---

**8.** Transcript of July 24, 1979 Motion to Stay Hearing at 111.

**9.** *Id.* at 112 (emphasis added).

**10.** At the Motion to Stay Hearing the district court also stated: "[I]n view of the fact that the press was allowed to be present and there was no direction to the press or attempt to instruct the press about which they might or might not publish, and it could be *assumed,* and I think that this is an assumption that can be safely made, that the press did publish something about this. *Nothing in the record about it."* Transcript of July 24, 1979 on Motion to Stay Hearing at 110–11 (emphasis added).

While any party seeking closure of a criminal proceeding, here the state, must carry the burden of justifying the need for closure in the first instance, in a habeas proceeding the burden of proof is on the habeas petitioner to show why federal post-conviction relief should be granted. 28 U.S.C. § 2254. Appellant has given us no basis for finding clearly erroneous the district

court's assumption that the press was present and reported the details of the testimony to the public.

**11.** *Douglas v. Wainwright,* 521 F.Supp. at 795, quoting II Trial Transcript at 214.

**12.** The actual presence of the press is significant in that it is a major factor in distinguishing a partially closed proceeding from one that is totally closed which requires a most "compelling interest" as a justification. *See, e.g., Globe Newspaper, Inc. v. Superior Court,* 457 U.S. at 607, 102 S.Ct. at 2620.

This is not to say that the presence of the press is the only method by which partially closed proceedings may be distinguished from those that are totally closed. For instance, whether or not the record has been made public and whether or not persons in addition to family members but less than the general public are allowed to remain are also factors to be considered. *See Aaron v. Capps,* 507 F.2d at 687.

be uninformed of any perjured testimony by Atkins. *See* discussion *supra* at 1541–1542. Likewise, Atkins' awareness of the presence of the press and all family members minimizes the risk that the witness would alter her testimony when the proceeding was partially closed as opposed to completely open. *See* text *supra* at 1541–1542.

Accordingly, as in *Aaron v. Capps*, 507 F.2d at 687–88, the practical impact of the closure here was not a kind presented when a proceeding is totally closed to the public. *Cf. In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Caudill v. Peyton*, 368 F.2d 563 (4th Cir.1966).

### C. The Reason for the Exclusion

■ As noted above, also crucial to a determination of whether the right to a public trial is violated is the reason for the closure. A substantial reason for even a partial closure is required. The Florida Supreme Court on direct appeal from Douglas' conviction stated in its review of the public trial issue that: "The basis of the motion was that the nature of the testimony was so embarrassing that there was no reason that

anybody should hear it unless necessary." *Douglas I*, 328 So.2d at 20. The court concluded that exclusion of the public for the purpose of protection of "public morality" does not present a violation of the right to a public trial. *Id.* at 20–21, *quoting Robertson v. State*, 64 Fla. 437, 60 So. 118 (1912).

■ In the habeas proceedings below, contrary to the state court finding that the reason for the exclusion was protection of public morality, the district court proceeded on the assumption that the purpose of the partial closure was "avoiding additional and unnecessary insult to the dignity of the witness." *Douglas v. Wainwright*, 521 F.Supp. at 796.

Pursuant to the powers and duties granted to a federal habeas court under 28 U.S.C. § 2254, the federal court is required to afford a state court finding of fact a "presumption of correctness," *Sumner v. Mata*, 449 U.S. 539, 549, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981), "unless the applicant shall establish or it shall otherwise appear . . ." that one of the conditions set forth in § 2254(d)(1)–(8) is present.[13] 28 U.S.C.

---

**13.** 28 U.S.C. § 2254(d) reads in its entirety:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State Court hearing;

(2) that the factfinding procedure employed by the State Court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State Court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by con-

§ 2254(d) (emphasis supplied). If none of the situations enumerated in § 2254(d) is presented, a habeas court may substitute its factual findings for that of the state court only if the habeas petitioner establishes "by convincing evidence that the factual determination by the state court was erroneous." *Id.* Even if one or more of the conditions is presented, a state court finding of fact still may be overturned only if a finding to the contrary is proved by a "preponderance of the evidence." *Sumner v. Mata,* 449 U.S. at 551, 101 S.Ct. at 771. In assessing a petitioner's claim, therefore, the habeas court must review the record and determine if the "presumption of correctness" applies, and, if so, whether or not the presumption has been rebutted, or, if not, whether a contrary finding is supported by a preponderance of the evidence. *Id.* at 547–51, 101 S.Ct. at 769–71. In the instant case, the district court failed in this duty.

■ Normally when faced with such an error we would remand to the district court for an application of the correct analysis. In the instant case, however, we have before us the identical record as did the district court in the initial proceedings and as would the lower court on remand. On the face of the record it is apparent that the state trial judge was presented with two asserted reasons for the closure: protection of the public morality and protection of the witness from embarrassment. *See Douglas v. Wainwright,* 521 F.Supp. at 795, *quoting* II Trial Transcript 213–14. *See also* IV Trial Transcript at 727. The Supreme Court of Florida ruled that one reason, protection of public morality, was sufficient to justify the closure. *Douglas I,* 328 So.2d at 20–21. It did not reach the question of whether there was any other reason for the closure, although the dissenting justice pointed out that undoubtedly the trial judge primarily was motivated by a desire to protect Atkins from embarrass-

ment. *Id.* at 23 (England, J., dissenting). Against this background, while we admonish the district courts that in habeas proceedings findings of fact apparently contrary to those made by the state court should be explained and justified under § 2254 and *Sumner v. Mata,* we conclude that the district court was not clearly erroneous in finding that the primary reason for the partial closure was protection of the witness from embarrassment.

■ Further, although we doubt that protection of the morality of the general public could qualify as a sufficient reason for even a partial closure, *United States v. Kobli,* 172 F.2d 919 (3d Cir.1949), we hold that the district court did not err in concluding that *protection of the witness* was sufficiently compelling to justify this partial closure, where, as we have held here, the partial closure does not undermine the purposes underlying the public trial right. *See United States ex rel. Latimore v. Sielaff,* 561 F.2d 691, 694–96 (7th Cir.1977); *Aaron v. Capps,* 507 F.2d 685 (5th Cir.1975); *Geise v. United States,* 262 F.2d 151–155 (9th Cir.1958), *cert. denied,* 361 U.S. 842, 80 S.Ct. 94, 4 L.Ed.2d 80 (1959).

Hence, we AFFIRM the denial of habeas relief on the public trial issue.[14]

**D.** *The Need for a Hearing and Findings*

■ Appellant also contends that, even if no actual deprivation of the public trial right occurred, error of constitutional dimension was committed when the state court failed to hold a hearing on the exclusion order and articulate in findings the reason for the partial closure. The failure to give interested parties an opportunity to be heard and to state reasons for closure has rendered closure orders constitutionally infirm in the cases implicating the press' and public's right of access to criminal trials. *Globe Newspaper Co. v. Superior*

---

vincing evidence that the factual determination by the State court was erroneous.

14. Appellant also argues that exclusion of the public during Atkins' testimony placed undue emphasis on her testimony, highlighting the importance of what she had to say. Such a

danger, however, is inherent in any closed or partially closed proceeding. Appellant's trial counsel sought no cautionary instruction to negate this risk. Given our holding that appellant was not deprived of a public trial, we also find this argument without merit.

*Court,* 457 U.S. at 609 n. 25, 102 S.Ct. at 2622 n. 25; *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. at 581, 100 S.Ct. at 2829 (plurality opinion); *id.* at 598, 100 S.Ct. at 2839 (Brennan & Marshall, JJ., concurring in judgment); *id.* at 600 & n. 5, 100 S.Ct. at 2840 & n. 5 (Stewart, J., concurring in judgment). *See also Newman v. Graddick, supra,* 696 F.2d 796 at 801, 803. *Cf. Gannett Co. v. DePasquale,* 443 U.S. at 376, 99 S.Ct. at 2903 (where hearing held and findings made as to need for exclusion, no error in closing pretrial hearing to the press). Certainly these procedural safeguards are no less crucial when closure is challenged as a violation of the defendant's sixth amendment right. Accordingly, we hold that an opportunity to be heard and adequate findings are required where any closure of the trial is contemplated and the defendant objects and requests an opportunity to be heard.

 In the instant case, however, even though defense counsel did object generally to the partial closure,[15] he failed to object in the trial court to the absence of a hearing or findings. The failure to object contemporaneously or to request a hearing and findings deprived the state court of the opportunity to correct the error. Appellant makes no attempt to justify, under the "cause and prejudice" standard of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the failure to make specific objection. Therefore appellant's right to an opportunity to be heard in and to findings from the state court has been waived.[16]

15. II Trial Transcript at 213.

16. We emphasize that even in the absence of a specific objection or a request for a hearing and findings the better course for the state court to follow is *sua sponte* to hold the hearing and make findings. Such findings should include the reason for the closure, the evidence that supports the need for the closure, the number of persons excluded and the number allowed to remain, and the presence or absence of the press. This procedure will facilitate both direct and federal habeas review. The federal courts in habeas proceedings accord appropriate state

## III. *Witherspoon Issue*

Appellant contends that the exclusion for cause of three members of the jury venire violated the Supreme Court mandate in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Witherspoon* the Court established that, in order to protect a defendant's right to be tried by a jury drawn from a cross-section of the community, members of the venire may not be excused for cause simply because they are conscientiously, religiously or morally opposed to the death penalty. "[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777 (footnote omitted). Rather, venirepersons may be excused for cause based on conscientious objection only if they indicate "unambiguously," *id.* at 515 n. 9, 88 S.Ct. at 1773 n. 9, that their views on the death penalty "would prevent them from making an impartial decision as to the defendant's guilt," *id.* at 513, 88 S.Ct. at 1772, or "that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them." *Id.* at 514, 88 S.Ct. at 1772. The court below rejected appellant's *Witherspoon* claims on the merits.

We, however, do not reach the merits of appellant's contention because appellant failed to raise the *Witherspoon* issue on direct appeal and in state post-conviction proceedings; the issue was raised for the

court findings the "presumption of correctness." *Sumner v. Mata,* 449 U.S. at 549, 101 S.Ct. at 770. Thus, the existence of such findings may alleviate the need for an evidentiary hearing in federal habeas court, *see* 28 U.S.C. § 2254(d), and the interests of finality in state criminal justice proceedings will be served. *See Engle v. Isaac,* 456 U.S. 107, 126, 128, 102 S.Ct. 1558, 1570, 1571, 71 L.Ed.2d 783, 800, 801 (1982); *Sumner v. Mata,* 449 U.S. at 549–50, 101 S.Ct. at 770; *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977).

first time since objection was made at trial in the federal habeas proceeding.

Florida Rule of Criminal Procedure 3.850 [17] has been interpreted by the Florida courts as barring the consideration of claims in state post-conviction relief proceedings that could have been but were not raised on direct appeal in the state courts. *Hargrave v. State,* 396 So.2d 1127 (Fla. 1981); *Hargrave v. Wainwright,* 388 So.2d 1021 (Fla.1980); *Johnson v. State,* 390 So.2d 1234 (Fla.App.1980). *See also Alvord v. State,* 396 So.2d 184, 191 (Fla.1981); *Pittman v. State,* 401 So.2d 934 (Fla.App.1981); *Savino v. State,* 397 So.2d 1236 (Fla.App. 1981); *Roth v. State,* 385 So.2d 114 (Fla. App.1980). This court in *Ford v. Strickland,* 696 F.2d 804 at 815–816 (11th Cir. 1983), held that, given this interpretation of Rule 3.850, petitioner was precluded from challenging admission of a confession for

the first time in federal habeas proceedings unless the "cause and prejudice" standard of *Wainwright v. Sykes* was met.[18] Douglas' failure to raise the *Witherspoon* issue on direct appeal or in Florida post-conviction relief proceedings [19] thus prevents him from raising the claim in federal habeas proceedings unless he establishes cause for the failure and actual prejudice resulting from the forfeiture.[20] *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

"Cause and prejudice" is a conjunctive standard, both prongs of which must be satisfied by the appellant before this court is free to ignore the procedural default and hear the merits of appellant's claim. *Engle v. Isaac,* 456 U.S. at 134 n. 43, 102 S.Ct. at 1575 n. 43, 71 L.Ed.2d at 804 n. 43. Appellant presents no argument that

**17.** Florida Rule of Criminal Procedure 3.850 reads in pertinent part: "An application for writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this rule, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."

**18.** Even though the "cause and prejudice" standard of *Wainwright v. Sykes* was originally developed in the context of a procedural default *at trial,* this circuit has applied the *Sykes* rationale in cases involving a procedural default in the course of a direct appeal from a state court conviction. *Ford v. Strickland, supra,* at 815–16; *Huffman v. Wainwright,* 651 F.2d 347 (5th Cir.1981); *Evans v. Maggio,* 557 F.2d 430, 433–34 (5th Cir.1977). We are bound by these rulings.

**19.** If a petitioner failed to raise a claim on direct appeal but raised it in post-conviction proceedings and the state court ruled on the merits, the federal court may proceed to the merits of the claim without inquiring as to the existence of cause and prejudice. *Thomas v. Blackburn,* 623 F.2d 383, 386 (5th Cir.1980), *cert. denied,* 450 U.S. 753, 101 S.Ct. 1413, 67 L.Ed.2d 380 (1981).

**20.** In *Ford v. Strickland, supra,* at 816 this court stated that a petitioner will be precluded from raising a claim for the first time in federal habeas proceedings if no "cause and prejudice"

is shown under the standards of *Wainwright v. Sykes, or* if petitioner deliberately has bypassed the state court procedure under the test of *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). A review of the language and impact of *Wainwright v. Sykes* shows, however, that where the "cause and prejudice" standard is applicable the deliberate bypass test is displaced. *Wainwright v. Sykes,* 433 U.S. at 87, 97 S.Ct. at 2506 ("cause and prejudice" is a "narrower," *i.e.* more stringent, standard than deliberate bypass and the Court "reject[ed]" the latter standard). *See Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 1572–73, 71 L.Ed.2d 783 (1982) (where there is a deliberate bypass of state courts, even if the attorney perceived that raising the claim in state court would have been futile, the "cause" standard of *Wainwright v. Sykes* cannot be met). Where there has been a deliberate bypass the "cause" standard can never be met and review will be barred; but absence of "cause" may be found in circumstances short of deliberate bypass. *Ford v. Strickland, supra,* at 816. Thus, deliberate bypass is subsumed in the "cause and prejudice" analysis. *Cf. Arnold v. Wainwright,* 516 F.2d 964, 967 (5th Cir.1975) ("cause" standard of *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), precursor of *Wainwright v. Sykes,* displaced use of deliberate bypass standard), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2230, 48 L.Ed.2d 833 (1976); *Rivera v. Wainwright,* 488 F.2d 275 (5th Cir.1974) (same). *See also Hockenbury v. Sowders,* 620 F.2d 111, 112–13 & n. 1 (6th Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 367 (1981).

the failure to raise the *Witherspoon* issues on appeal was justified by cause; nor, in the opinion of this court, does any sufficient argument exist. The *Witherspoon* issues were certainly not novel ones, as *Witherspoon* was decided in 1968, several years before appellant's trial. Indeed, as evidenced by timely objections during the voir dire, trial counsel was aware of the issues. Appellant argues only that grave prejudice resulted from the alleged *Witherspoon* violations. Even if the prejudice prong of the *Wainwright v. Sykes* test were satisfied, appellant fails to meet the dual standard of prejudice *and* cause. Accordingly, a federal habeas court is not free to decide the merits of the *Witherspoon* issues.[21] For this reason the judgment of the district court denying habeas relief on this claim is AFFIRMED.

### IV. *Consideration of Prior Invalid Convictions*

Appellant next argues that the Florida Supreme Court, in reviewing the trial judge's imposition of the death sentence, improperly relied on several prior invalid convictions in affirming the death sentence. Appellant contends that such use violated his right to meaningful, independent appellate review deemed necessary to the capital sentencing process under *Proffitt v. Florida,* 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913, *reh. denied,* 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976) and state supreme court decisions interpreting the Florida statute, *e.g., Songer v. State,* 322 So.2d 481, 484 (Fla.1975); *State v. Dixon,* 283 So.2d 1, 10 (Fla.1973).

Convictions of Douglas for grand larceny, three escapes, two breakings and enterings and one forgery were presented in a presentence investigation report specifically requested and used by the trial judge in his search to find mitigating evidence. Appellant and appellee are in agreement that all of these convictions, except the one for forgery, previously had been vacated under the authority of *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) and *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), because appellant was not represented by counsel. Accordingly, these uncounseled convictions must be treated as nullities.[22] The state concedes this, but, in support of its argument that use of the convictions deprived appellant of no constitutional rights, it relies on the fact that the trial court was aware at sentencing that some of the convictions were uncounseled and restricted its use of them accordingly. The trial court in its findings of fact specifically stated: "The presentence investigation report was considered only in light of its failure to reflect mitigating circumstances."[23] This statement was repeated by the

---

**21.** We note that, even if *Witherspoon* were violated, appellant could not have been prejudiced by any such violation, at least as to sentencing, because the jury recommended life imprisonment. Thus, any *Witherspoon* error in the jury selection must have been harmless.

**22.** The record does not reveal specifically the procedural context in which these convictions were vacated. *See* Record at 748–50.

**23.** *Douglas v. Wainwright,* 521 F.Supp. at 793, quoting II Trial Transcript at 759.

Fla.Stat.Ann. § 921.141(3) specifically requires consideration of mitigating circumstances before imposition of the death penalty:

(3) Findings in support of sentence of death.—Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:

(a) That sufficient aggravating circumstances exist as enumerated in subsection (5), and

(b) That there are insufficient mitigating circumstances to outweigh the aggravating circumstances.

In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (5) [aggravating circumstances] and (6) [mitigating circumstances] and upon the records of the trial and the sentencing proceedings. If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with § 775.-082.

judge at the hearing on the motion for state post-conviction relief.[24]

Appellant does not contend that the *trial court* used the invalid convictions for any purpose other than that stated, but argues that use of the invalid convictions by the Florida Supreme Court violated the right to meaningful appellate review. Although appellant's brief is less than clear as to what specific rights he claims were violated, it does identify two issues of constitutional dimension that are embodied in this one claim.

The one issue incorporated in appellant's argument is that under *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977), appellant has a right not to have his "death sentence rest[ ] on an erroneous factual predicate," and that but for use of the invalid convictions some mitigating circumstance would have been found. In the brief on appeal to this court, appellant's counsel state: "By considering appellant's prior invalid convictions it prevented the trial court and the Florida Supreme Court from finding 'the defendant has no significant history of prior criminal [activity]' as a mitigating factor."[25]

In *Gardner* the trial judge in imposing the death penalty relied on a presentence report, parts of which were deemed confidential and not revealed to defense counsel. The Florida Supreme Court affirmed the death sentence without reviewing the confidential portion of the presentence report. A plurality of the United States Supreme Court held that the trial court's failure to provide counsel access to the report violated due process. *Gardner v. Florida,* 430 U.S. at 362, 97 S.Ct. at 1206.[26] The plurality stated: "Our belief that debate between adversaries is often essential to the truth seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases." *Gardner v. Florida,* 430 U.S. at 360, 97 S.Ct. at 1205. This "opportunity to comment" is intended to guarantee that "the death sentence [does not] rest[ ] on an erroneous factual predicate." *Id.* at 360, 362, 97 S.Ct. at 1205, 1206.

In the instant case appellant does not contend that he was denied the "opportunity to comment" on the presentence report. Indeed trial counsel brought to the attention of the trial court the fact that virtually all of appellant's previous convictions were invalid under *United States v. Tucker, supra.* The trial court specifically disclaimed reliance on the convictions as an aggravating circumstance but also specifically found that even without the uncounseled convictions no mitigating circumstances were presented. Record at 751–52. While there is some merit to the contention that a mitigating circumstance was presented,[27] appel-

---

**24.** Transcript of July 17, 1979 Hearing on Motion for Post Conviction Relief at 7.

**25.** Appellant's Brief at 23, quoting Fla.Stat. Ann. § 921.141(6)(a).

**26.** Justice White concurred on the basis that the procedure failed to meet the " 'need for reliability' " which the Court held in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), is required under the eighth amendment in order to impose the death penalty. *Gardner v. Florida,* 430 U.S. at 364, 97 S.Ct. at 1207.

**27.** Once the uncounseled convictions are removed from appellant's record, there remains only the conviction for forgery, and evidence of a statutorily approved mitigating circumstance may be presented. Fla.Stat.Ann. § 921.-141(6)(a) identifies as a mitigating circumstance that "[t]he defendant has no *significant* history of prior criminal activity." (emphasis added). While this court will not be heard to say that a conviction for forgery is not serious, what qualifies as "significant" under the Florida statute must be evaluated in light of Florida Supreme Court interpretations of this factor and in relation to the grave issue of whether or not the death penalty should be imposed. The Florida Supreme Court has approved an interpretation of this provision supporting a finding of mitigation where the defendant had a prior conviction for burglary and had admitted to a theft. The state supreme court apparently accepted the lower court's finding that these two incidents of prior criminal activity combined did not rise to the level of a "significant history of prior criminal activity." *Salvatore v. State,* 366 So.2d 745, 748, 752 (Fla.1978), *cert. denied,* 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115, *reh. denied,* 444 U.S. 975, 100 S.Ct. 474, 62 L.Ed.2d 393 (1979). *Cf. Smith v. State,* 407 So.2d 894, 900–01 (Fla.1981) (confessions to "various" crimes constituted significant history); *Ruffin*

lant never appealed the finding of no mitigating circumstances to the Florida Supreme Court, as is evidenced by the opinions of that court in *Douglas I,* 328 So.2d at 22 and *Douglas II,* 373 So.2d at 896.

Even if we assume *arguendo* that use of the invalid convictions made the predicate for appellant's sentence erroneous,[28] *Gardner* did not create an absolute constitutional right to have the death sentence rest on a completely accurate factual basis regardless of the failure of counsel to take advantage of opportunities to bring erroneous information to the attention of the state courts. To interpret the *Gardner* decision in such a way would be to circumvent the ruling of *Wainwright v. Sykes* and its progeny, *see, e.g., Ford v. Strickland, supra* (applying *Sykes* to failure to raise issues on direct appeal), which imposes a burden on the habeas petitioner's counsel either to raise claims first in state court or to explain the failure to have done so. *Gardner* was decided on the ground that the *procedure* of keeping information confidential violated due process protections. Here appellant was afforded all the procedure necessary to ensure that his death sentence did not rest on "an erroneous factual predicate." Counsel's failure to take advantage of the procedure is simply not redressable under the theory of *Gardner.*

The second element of the claim that use of the uncounseled convictions presents a constitutional violation, and the argument most clearly presented, is that the Florida Supreme Court failed to limit its reliance on

the prior invalid convictions to negation of mitigation.

In affirming the imposition of the death sentence the state supreme court stated:

The evidence is clear that the murder was committed in a cold and calculated manner. No evidence of mitigation was produced. *The trial judge buttressed his decision that the death penalty should be imposed by the inclusion in his findings of fact information from a presentence investigation report* which the defendant was given the opportunity to traverse. The report reflected that the defendant was 37 years old and had been previously convicted of a number of felonies including grand larceny, breaking and entering (twice), forgery, and escape (three times) as well as numerous misdemeanors. The defendant had previously received penitentiary sentences aggregating seventeen years and an undesirable military discharge. We conclude, as did the trial judge, that the death penalty is the proper sentence.

*Douglas I,* 328 So.2d at 22 (emphasis supplied).

Based on this portion of the supreme court's opinion and particularly in light of the failure of that court explicitly to state that it too was limiting reliance on the prior invalid convictions to support a finding of absence of mitigation, appellant in effect argues that this court must infer that the invalid convictions were used as evidence of aggravation and that such use tainted the reliability of the review process.[29]

---

*v. State,* 397 So.2d 277, 283 (Fla.1981) (previous murder is significant history); *Washington v. State,* 362 So.2d 658, 666 (Fla.1978) (course of burglaries, confessions to continuous stealing of property constitutes significant history), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2063, 60 L.Ed.2d 666 (1979). Clearly, this statutory mitigating circumstance has not been limited to absence of all serious criminal activity. Forgery is a serious offense, but surely no more "significant" than burglary or theft. Given the prior interpretation of this mitigating circumstance, there is a possibility that if Douglas had appealed the trial court's finding of no mitigating circumstances the Florida Supreme Court would have found the finding erroneous.

**28.** *See* note 27 *supra.*

**29.** Appellant more clearly made this claim in the state supreme court in state post-conviction relief proceedings. There the claim was rejected under a harmless error rationale in that no mitigating circumstances had been found and the Florida Supreme Court relies on a presumption that death is the appropriate sentence where there are no mitigating factors and some valid aggravating factors. *Douglas II,* 373 So.2d at 896, citing *Spenkellink v. State,* 372 So.2d 65 (Fla.1979) (England, C.J., concurring); *State v. Dixon,* 283 So.2d 1 (Fla.1973). *Cf. Riley v. State,* 366 So.2d 19, 22 (Fla.1978) (remand required where improper aggravating circumstances considered and a mitigating circumstance existed). Appellant does not chal-

The federal habeas court below ruled that the trial judge's explicit limitation of use of the presentence report to verification of absence of mitigating evidence was conclusive on the issue of any impropriety in the trial judge's or the state supreme court's handling of the report. *Douglas v. Wainwright,* 521 F.Supp. at 793. We affirm that conclusion.

To support his argument that the Florida Supreme Court used the convictions as aggravating evidence, appellant relied solely on that court's statement that the trial court used the convictions to "buttress[ ] his decision that the death penalty should be imposed," *Douglas I,* 328 So.2d at 22, and the federal district court's observation that "[t]he Florida Supreme Court gave some support to . . . the possibility that it had [ ] considered such convictions in its review of petitioner's sentence." *Douglas v. Wainwright,* 521 F.Supp. at 793. We conclude that appellant's argument provides no basis for finding that the Florida Supreme Court did not limit use of the prior convictions to support the absence of mitigating evidence.[30]

A review of the structure of the portion of the Florida Supreme Court opinion relating to the presentence report supports this conclusion. In affirming the death sentence and analyzing whether the death penalty was excessive on the facts of this case, the supreme court first discussed and approved the trial court's finding that the crime qualified as heinous, atrocious and cruel, satisfying statutory aggravating circumstance. Fla.Stat.Ann. § 921.141(5)(h). *Douglas I,* 328 So.2d at 22–23. The court

next discussed the cold-bloodedness of the killing, apparently alluding to aggravating circumstance. § 921.141(5)(i). *Id.* at 23.[31] *Then* the court proceeded to discuss the absence of mitigating evidence. In conjunction therewith, the court noted the trial judge's reliance on the presentence report and the prior convictions and other information presented in the report. Since all of the discussion of the information contained in the report is so obviously separated from the discussion of any aggravating circumstance, the logic of the relevant portion of the opinion flows only if one concludes that the convictions were considered in light of mitigation. *See Elledge v. State,* 408 So.2d 1021, 1023–24 (Fla.1981) (reference to organization of trial judge's order verifies that evidence was used to show absence of mitigation, not to support an aggravating factor). As appellant provides no other evidence that the information was used for any purpose other than to negate a finding of mitigating factors, there is no basis for a finding that the information was used as evidence of aggravation.

The law is clear that the sentencer's knowledge of invalid convictions in and of itself does not require resentencing where the court has not relied on the invalid convictions to enhance the punishment. *United States v. Missio,* 597 F.2d 60, 61 (5th Cir.1979); *United States v. Gaither,* 503 F.2d 452 (5th Cir.1974); *Lipscomb v. Clark,* 468 F.2d 1321, 1323 (5th Cir.1972). *See also, Farrow v. United States,* 580 F.2d 1339, 1345 (9th Cir.1978). Where counsel failed on direct appeal or in state habeas proceed-

---

lenge this presumption and we make no ruling as to its constitutional validity.

**30.** The Supreme Court's recent decision in *Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (plurality opinion); *id.* at ——, 103 S.Ct. at 3431 (Stevens & Powell, JJ., concurring), indicates that the use of nonstatutory aggravating factors is not a constitutional infirmity. The plurality stated that there is "no constitutional defect in a sentence based on both statutory and nonstatutory aggravating circumstances," and that failure of the Florida Supreme Court to control use of nonstatutory factors is only an error of "state law." ——, 103 S.Ct. at 3428. The court did say however

that use of such factors is of constitutional magnitude if it rises "for some other reason to the level of a denial of rights protected by the United States Constitution." *Id.* Here, of course, if the State Supreme Court did use uncounseled convictions to enhance punishment, the principles of *United States v. Tucker* and *Gideon v. Wainwright* would be violated.

**31.** This aggravating circumstance was not part of the trial court's findings but appellant does not raise any challenge to this apparently additional finding by the Florida Supreme Court on direct review.

ings to bring to the attention of the state courts that use of the invalid convictions may have precluded a finding of a mitigating circumstance, and where there is insufficient evidence to support the contention that the convictions were used in any other way that would present a federal constitutional violation warranting habeas corpus relief, we affirm the denial of habeas relief on this ground.

## V. *Judge's Imposition of Death Sentence after Jury Recommendation of Life Imprisonment*

■ In the sentencing phase of the bifurcated trial, the jury recommended that Douglas be sentenced to life imprisonment, rejecting the only other possible sentence, death. Under Fla.Stat.Ann. § 921.141(2) a jury sentencing determination is treated as merely "advisory" and the trial judge is the final arbiter of the sentence.[32] Appellant argues, supported by a thorough brief by amicus curiae, that to fail to treat an "advisory" jury sentence of life imprisonment as final violates the due process protections of the fourteenth amendment and, additionally, the double jeopardy clause of the fifth amendment, as applied to the states through the fourteenth. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

Appellant does not argue that jury sentencing is constitutionally required in capital cases, but rather that where a state provides for jury recommendations of sentence, a recommendation of life may not be overturned by the trial judge. This argument is based primarily on an analogy, in light of the similarities between the procedures employed in the guilt phase of all criminal jury trials and the sentencing phase in capital trials in Florida, to the finality afforded a jury verdict of acquittal

in the guilt phase of criminal trials. Appellant's argument, however, is foreclosed by three United States Supreme Court decisions that have approved the constitutionality of the Florida statute.

In *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Court specifically approved the provision calling for judicial rather than jury sentencing. Although the jury in *Proffitt* had recommended death so that the Court was not directly confronted with the issues raised by imposition of the death penalty after a jury recommendation of life imprisonment, the Court was aware that the statute provided for judicial override of a jury life recommendation. This awareness is evidenced by its citation to *Tedder v. State*, 322 So.2d 908 (1975), in which the Florida Supreme Court enunciated the standard that must be satisfied before a judge can reject a jury life recommendation.[33]

The Supreme Court in *Dobbert v. Florida*, 432 U.S. 282, 295 & n. 9, 97 S.Ct. 2290, 2299 & n. 9, 53 L.Ed.2d 344 (1977), more clearly approved the process whereby the judge may impose death after a jury recommendation of life. There the Court considered a challenge to the Florida capital sentencing statute under the ex post facto clause of Article I, § 10 of the United States Constitution.[34] Dobbert had been sentenced to death under the statute here in question. The challenge was based on the fact that under the statute in effect prior to the current one and at the time Dobbert committed the murder jury sentencing decisions were final. Since in his case the judge imposed the death sentence after a jury recommendation of life, Dobbert alleged that the new statute acted as an ex post facto law as applied to him.

---

**32.** Once defendant has been convicted of the capital felony, the only sentencing options are life imprisonment or death. Fla.Stat.Ann. § 921.141(2)(c) and (3).

**33.** "A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life,

the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." *Tedder v. State*, 322 So.2d at 910.

**34.** "No State shall ... pass any ... ex post facto law ...." Article I, § 10, United States Constitution.

The Court decided that the current statute, enacted in 1972 in response to *Furman,* was not an ex post facto law because it represented only a procedural change, and one which, in general, was an ameliorative, not an onerous, revision of the law. *Id.* at 294, 97 S.Ct. at 2298. In discussing the generally ameliorative nature of the current statute, Justice Rehnquist quoted the standard of *Tedder*,[35] and then stated: "A jury recommendation of life may be overridden by the trial judge only under the exacting standards of Tedder." *Id.* at 295–96, 97 S.Ct. at 2299. In a footnote the Court went on to say: "The fact that the trial judge imposed a death sentence after the jury had recommended life in this case in no way denigrates the procedural protections afforded by the new procedure. The judge did so in circumstances where there were obvious and substantial aggravating factors, and where there had been no significant mitigating factors adduced." *Id.* at 296 n. 9, 97 S.Ct. at 2299 n. 9.

Appellant and amicus curiae would have this court disregard the Supreme Court's approval of the Florida procedure whereby a trial judge may override a jury life recommendation on the basis that the language in both *Proffitt* and *Dobbert* was only dicta, as the Court was not there directly presented with the precise issue now raised. Further, amicus curiae argue that language in the more recent Supreme Court decision, *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), casts doubt on the constitutionality of the practice here challenged and evidences that the Supreme Court would now hold that a jury recommendation of life should be treated as final where a jury, based on statutory findings, has rejected the death penalty. *See id.* at 445–46, 101 S.Ct. at 1861–62. *But see United States v. DiFrancesco,* 449 U.S. 117, 132, 101 S.Ct. 426, 434, 66 L.Ed.2d 328 (1980).

Whatever the merit of appellant's claim and whatever the degree of speculative doubt *Bullington* cast on the continued viability of the approval in *Proffitt* and *Dobbert* of the practice now challenged, since this case was argued the Supreme Court has clearly reaffirmed its approval of the Florida procedure. *Barclay v. Florida,* —— U.S. ——, at ——, ——, 103 S.Ct. 3418, at 3425, 3427, 3428, 77 L.Ed.2d 1134 (1983) (plurality opinion); *id.* at —— – ——, 103 S.Ct. at 3426–3427 (Stevens & Powell, JJ., concurring). Under the decisions in *Barclay, Dobbert* and *Proffitt,* the system of overriding jury recommendations of life imprisonment is not unconstitutional.

## VI. *Ineffective Assistance of Counsel*

 Appellant finally argues that he was deprived of the effective assistance of counsel at the penalty phase of the trial due to trial counsel's failure to consult with appellant and other potential witnesses prior to the penalty phase and to investigate and present evidence which might have been considered mitigating. He also points to counsel's comments to the sentencing judge prior to the penalty phase. Appellant argues that even though the jury returned an advisory sentence of life imprisonment, he was prejudiced by counsel's alleged ineffectiveness and its impact on the sentencing judge. He also contends that the district court below erred in not holding an evidentiary hearing on the ineffective assistance claim.

The sixth amendment right to counsel extends to criminal defendants the right to "*effective* assistance of counsel, that is, counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances." *Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir. Unit B 1982) (en banc),[36] *cert. granted,* —— U.S. ——; 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960), *adhered to en banc,* 289 F.2d 928 (5th Cir.), *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). The assistance of counsel must not

---

**35.** *See* note 33 *supra.*

**36.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

be judged by benefit of hindsight, but must be reviewed "from the perspective of counsel, taking into account all of the circumstances of the case, but only as those circumstances were known to him at the time in question." *Washington v. Watkins,* 655 F.2d 1346, 1356 (5th Cir.1981). This standard makes it imperative that the circumstances as known to counsel at the time in question be reflected in the record. Where the record is inadequate, complete review of the habeas claim is thwarted.

The district court stated, in reference to all of appellant's habeas claims, that "Petitioner did not seek an evidentiary hearing and the Court found that none was required." *Douglas v. Wainwright,* 521 F.Supp. at 792. As accurately pointed out in the Brief for Appellant and reflected in the record, however, counsel for Douglas did request an evidentiary hearing on the ineffective assistance claim.[37]

Regardless of the request, the rule in this circuit is that a federal habeas court must hold an evidentiary hearing and find facts relevant to the habeas claim where the state has not held an evidentiary hearing that adequately develops material facts and a complete record on which the district court can rely in resolving the habeas issues. *Guice v. Fortenberry,* 661 F.2d 496 at 500 (5th Cir.1981); *Scott v. Estelle,* 567 F.2d 632 (5th Cir.1978); *Goodwin v. Smith,* 439 F.2d 1180 (5th Cir.1971). *See also Jordan v. Estelle,* 594 F.2d 144 at 146 (5th Cir.1979); *Burden v. State,* 584 F.2d 100 at 102 (5th Cir.1978) (where state record is inadequate to assess merits of habeas claim, district court must hold an evidentiary hearing). *Cf. Thomas v. Zant,* 697 F.2d 977 (11th Cir.1983) (where state has held an evidentiary hearing but material facts are not adequately developed, absent inexcusable neglect/deliberate bypass by petitioner, a federal evidentiary hearing must be held); *Guice v. Fortenberry,* 661 F.2d 496, 506–07 (5th Cir.1981) (en banc) (same). Exceptions to this general rule are recognized where either (1) the facts alleged by appellant,

even if proved, would indicate he is not entitled to relief, *Guice v. Fortenberry,* 661 F.2d at 503; *Easter v. Estelle,* 609 F.2d 756 (5th Cir.1980); *Cronnon v. Alabama,* 587 F.2d 246 (5th Cir.), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1978); or (2) even if appellant alleged sufficient relevant facts, "the record before the district court was sufficient for a proper examination of [petitioner's] claims." *Winfrey v. Maggio,* 664 F.2d 550, 552 (5th Cir.1981). *See Flores v. Estelle,* 578 F.2d 80 (5th Cir. 1978), *cert. denied,* 440 U.S. 923, 99 S.Ct. 1253, 59 L.Ed.2d 477 (1979) (where state has provided a full and fair hearing on the issue raised in federal habeas, based on that record the federal court can adjudicate without repeating the hearing process).

In the instant case, as the state court did not hold an evidentiary hearing on this claim, the district court did not have the benefit of a record from such a proceeding.

Even so, having reviewed the trial transcript, we conclude that "the record before the district court was sufficient for a proper examination of [petitioner's] claims." *Winfrey v. Maggio,* 664 F.2d at 552. Based on that record, however, the district court's conclusion that the trial counsel was reasonably effective was erroneous and we reverse.

Assessment of the effectiveness of counsel is a mixed question of law and fact. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708 (1980). Hence the clearly erroneous standard does not apply to the district court's judgment on this issue. *Proffitt v. Wainwright,* 685 F.2d 1227, 1247 (11th Cir. 1982). Nor does the presumption of correctness of 28 U.S.C. § 2254(d) apply to the state court's conclusion of effectiveness.[38] *Goodwin v. Balkcom,* 684 F.2d 794, 804 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983).

The record shows Douglas' trial was the first case in that county under the Florida capital punishment statute enacted

---

**37.** Transcript of July 24, 1979 Motion to Stay Hearing at 88–90.

**38.** Of course, these deferential standards do apply to findings of historical fact.

after *Furman v. Georgia.* At commencement of the penalty phase of the trial, after the state indicated that it would rely on the guilt phase evidence to support the finding of aggravating circumstances, defense counsel proceeded to make an argument to the jury for mercy. The state objected on the ground that the proceeding was for presenting evidence, not argument. The court instructed defense counsel to proceed with the evidence. Defense counsel responded: "I have no evidence to submit to the Court at this time." IV Trial Transcript at 609–10. The judge then called for a conference with all counsel in his chambers, in which he explained to defense counsel that mitigating evidence should be produced at this phase of the trial.

Defense counsel replied: "Well, let the record show from the hour of 12:30 to 1:30 or 2:00 [the recess time between the guilt and penalty phases], that the defendant has been unable to obtain any evidence and objects to proceeding at this time with the shortness of notice—" *Id.* at 610–11. When asked by the court what evidence he would wish to obtain counsel stated: "I don't know, Your Honor. Let the record show that the attorney for the defendant does not know at this time. He does not know what he could obtain or what he might obtain." *Id.* at 611. Counsel for the state then pointed out that the case had been set for trial for a considerable period, that the possibility always existed that Douglas would be convicted, and that the statute sets forth what evidence could be presented at the sentencing phase. *Id.*

The court suggested to defense counsel that he put appellant's mother on the stand to testify that "he's been a good boy. . ." *Id.* at 612. Defense counsel's response was: "But he hasn't been a good boy." *Id.*

The court then asked whether counsel had discussed with Douglas the possibility of his testifying in his own behalf. Counsel admitted: "No, Your Honor, I have not." *Id.*

At the court's suggestion Douglas was brought into the conference. The court gave a brief explanation to him about his right to testify on his own behalf and introduce evidence in mitigation. *Id.* at 614. The judge then prepared to leave so that counsel would discuss with Douglas the possible importance of taking the stand and presenting mitigating evidence. The judge stated: "I don't want you to say anything here before me, because in [the] ultimate analysis, I have the responsibility of [imposing sentence], so I want to make sure that you have every opportunity to present any evidence which you may have tending to mitigate this crime." *Id.* Before the judge could leave, Douglas stated he did not want to take the stand. The judge asked him if he realized he was giving up a valuable right. Douglas answered affirmatively, then was taken outside, without ever conferring with defense counsel.

Defense counsel's first statement after Douglas left was: "I'm not completely familiar with a proceeding like this. This is the first I've ever been involved in." *Id.* at 615. After asking the court's guidance as to what arguments he could make to the advisory jury, defense counsel stated: "I mean, I don't want to get in an argument with the court and I don't understand the statute." *Id.* at 615–17. Counsel for the state pointed out that his argument was completed "unless some testimony is offered." *Id.* at 617. Defense counsel emphasized again: "I have none. For the purpose of the record___This man will appeal, I'm sure. . . . The attorney for the defendant objects to the entry of proceedings supposed__commenced at 2:00 o'clock, after a verdict rendered at 12:30, on the grounds he did not have ample time to either investigate or prepare any such argument, evidence, or otherwise, as might be presented in behalf of the defendant for mitigation." *Id.* at 617. The court then noted that if counsel could point to some mitigating evidence he hoped to ascertain, the court would consider granting a continuance. Defense counsel rejoined he was "not aware of any witnesses that he might call; he's not aware of any evidence that he might present___." *Id.* at 618. The court asked if counsel had discussed this with his

client. Counsel said: "Briefly, yes, Your Honor... There's been a short discussion with the client and due to the shortness of time that neither the client nor his attorney is prepared to offer anyone." *Id.* at 618. It was thus clear that the only discussions with appellant did not include whether Douglas should take the stand and occurred only in the time between the guilt and penalty phase, during counsel's avowed lack of understanding of that phase, and even before the judge attempted to alleviate counsel's lack of understanding.

Toward the end of the conference the following colloquy ensued:

> Defense counsel: Judge, I'm at a loss. I really don't know what to do in this type of proceeding. If I'd been through one, I would, but I've never handled one except this time.
>
> The Court: I think you've got the right to get up there and talk this is a human life.
>
> Defense Counsel: Well, *that's the only thing I can say.*

*Id.* at 620 (emphasis added).

The arguments to the jury were given. The jury unanimously recommended life imprisonment. The trial judge, before whom all these statements by counsel were made, overrode the jury recommendation and imposed the death penalty. IV Trial Transcript at 754–55.

The district court ruled that defense counsel's statements indicating a lack of understanding of the procedure and importance of the proceeding could not be taken at face value because "[e]xperience indicates that some people depreciate their own knowledge and ability as a trial tactic for persuasive reasons." *Douglas v. Wainwright,* 521 F.Supp. at 807. We disagree. Even if the statements made by counsel could be deemed strategic, for the reasons set forth *infra* this strategy falls within the category of choices that are "so patently unreasonable that no competent attorney would have made it." *Washington v. Strickland,* 693 F.2d 1243, 1254 (5th Cir. Unit B 1982) (en banc), *cert. granted,* ——

U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983).

The district court found counsel effective because "[w]ith the patient and entirely fair procedure followed by the trial judge Mr. Kirkland did talk with the petitioner several times between the guilt and penalty stages of the trial." *Douglas v. Wainwright,* 521 F.Supp. at 807.

Even if this statement of the facts were not clearly erroneous, which it is, talking to the defendant in a span of an hour before the sentencing phase of the trial does not meet the standards of effective assistance. In *Washington v. Strickland,* 693 F.2d at 1252, the court ruled that "permissible trial strategy can never include the failure to conduct a reasonably substantial investigation into a defendant's one plausible line of defense." *See also Goodwin v. Balkcom,* 684 F.2d 794, 805 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983) ("At the heart of effective representation is the independent duty to investigate and prepare"); *Weidner v. Wainwright,* 708 F.2d 614, 616 (11th Cir. 1983).

As indicated above, counsel here conceded before the trial court that he had done nothing to prepare for the penalty phase of the trial. He did not discuss with the defendant the possibility of taking the stand to ask for mercy. The district court stated that Douglas "made it clear that he did not want to testify." *Douglas v. Wainwright,* 521 F.Supp. at 807. The record shows, however, that appellant's statement that he did not want to testify was in response to a question by the judge after *no* consultation with counsel and just a few minutes before the sentencing proceeding was to begin.

Further, while appellant had not suggested to counsel any witnesses who could have been called to testify, counsel had discussed the need for such a suggestion, if at all, only "briefly" between the guilt and sentencing phases. As evidenced by the conference in the judge's chambers, counsel did not understand the purpose of the penalty phase, so he would have been unable to advise appellant as to the need for and the

significance of witnesses at the penalty phase.

In *Scott v. Wainwright*, 698 F.2d 427, 429–30 (11th Cir.1983), this court determined that because a guilty plea cannot be made knowingly and voluntarily if counsel fails to advise the defendant of the options available to him, ineffectiveness is presented when that advice is lacking. So too, here, counsel's failure to advise appellant of the importance of taking the stand or suggesting witnesses evidences blatant ineffectiveness.

The most egregious examples of ineffectiveness do not always arise because of what counsel did *not* do, but from what he *did* do—or say. Apparently failing to appreciate that the trial judge was the ultimate sentencer, counsel repeatedly emphasized to the judge, during the conference in chambers and out of the hearing of the jury, that not only did counsel have no evidence to proffer at that time but that apparently there was no mitigating evidence that could be produced in Douglas' case. He explicitly volunteered that appellant had "not been a good boy" and therefore no purpose would be served by his mother testifying.[39] He highlighted before the judge that all he could argue to the jury was that Douglas' was a human life because there was no other evidence.

Counsel's ineffectiveness cries out from a reading of the transcript. *See Young v. Zant*, 677 F.2d 792, 798 (11th Cir.1982) (although degree of preparation necessary may be difficult to discern, competent counsel would have handled the case far differently than did trial counsel). The district court's conclusion to the contrary is error.

In *Washington v. Strickland*, 693 F.2d at 1258, this court held that a habeas petitioner may prevail on an ineffective assistance claim only if he shows denial of effective assistance and actual prejudice to the course of his defense. In so doing we rejected the allegedly harsher standard of prejudice set forth in *United States v. Decoster*, 624 F.2d 196, 208 (D.C.Cir.1979) (en banc), which required a habeas petitioner to show a "likelihood that counsel's inadequacy affected the outcome of the trial." Certiorari was granted, apparently because of this conflict. —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). Because, under virtually any standard, prejudice is evident on the face of the record, it is not necessary that we withhold decision in this matter pending the Supreme Court's resolution of the conflict.

Even if we assume for these purposes that there was no mitigating evidence that could have been produced,[40] a vital difference exists between not producing any mitigating evidence and emphasizing to the ultimate sentencer that the defendant is a bad person or that there is no mitigating evidence. This situation can be analogized to one where instead of simply not putting a defendant with a criminal record on the stand, defense counsel in closing argument says: "You may have noticed the defendant did not testify in his own behalf. That is because he has a significant prior record of convictions and we did not want the prosecutor to cross-examine him about them." Similarly, the instant case is analogous to one where the state presents its evidence, the defense presents none, but, rather than maintaining silence or arguing to the jury about reasonable doubt, defense counsel states: "You may have noticed we did not present any evidence for the defense. That was because I couldn't find any."

---

**39.** The district court made a factual determination that appellant did not want his mother to testify. *Douglas v. Wainwright*, 521 F.Supp. at 807. This is clearly erroneous. All the record reveals is that he did not want his mother brought into the conference in the judge's chambers. IV Trial Transcript at 614.

**40.** However, as noted on page 23 of appellant's brief, and discussed *supra* note 27, the record as it stands reveals that some mitigating evidence in the form of "no significant history of prior criminal activity" may have existed. Fla. Stat.Ann. § 921.141(6)(a). Further, counsel's failure to advise appellant of the importance of taking the stand or suggesting witnesses makes virtually meaningless, for purposes of assessing prejudice, Douglas' forebearance of the opportunity to testify or suggest potentially mitigating evidence or other possible witnesses.

Here actual prejudice is readily discernable. The advisory jury did not hear the statements made by counsel in the judge's chambers. They *unanimously* recommended life imprisonment. The judge who heard all the same evidence as did the jury but in addition was privy to the counsel's comments and behavior imposed the death sentence.

We hold that counsel's ineffective representation created both an "actual and substantial disadvantage to the course of [Douglas'] defense," *Washington v. Strickland,* 693 F.2d at 1258, and a great "likelihood that counsel's inadequacy affected the outcome of the trial." *United States v. Decoster,* 624 F.2d at 208.

The denial of habeas corpus relief on the claim of ineffective assistance at the penalty phase is REVERSED. The matter is REMANDED to the district court to issue the writ unless the state resentences appellant in appropriate proceedings within a reasonable time.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

RONEY, Circuit Judge, concurring in part and dissenting in part.

I concur in the affirmance of the denial of habeas corpus relief as to the conviction. I specially concur in the result reached in Part II, Public Trial Issue. I do not concur in that part of the opinion which attempts to address factual situations not here present, nor in such other portions of the opinion which are not necessary to the affirmance on the public trial point. I concur fully in Parts III, IV and V.

I respectfully dissent from Part VI of the opinion which holds that defendant was prejudiced at the penalty phase because of statements made by his attorney to the sentencing judge, outside the hearing of the jury. That counsel was effective before the jury is conclusively shown because the jury recommended life, the best it could do for defendant. Under such circumstances, it seems to me to skew the system where we fault the attorney for honestly and frankly discussing his case with the trial judge.

Somehow, I always thought that was precisely what attorneys are supposed to do. Certainly the judge is supposed to impose the death penalty only on the records of the trial and sentencing proceedings. In the ten years since this crime was committed, defendant has yet, as far as the records show, to come up with the suggestion of any hard fact that would tend to mitigate this atrocious crime. Thus the failure to produce mitigating evidence was not the fault of the attorney.

I would affirm the district court.